UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOSEPH W. FINCH, et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
|   vs. | )   CASE NO: 1:08-cv-0432-DML-RLY |
| | ) |
| CITY OF INDIANAPOLIS, et al., | ) |
| | ) |
|     Defendants. | ) |

Order on Defendants' Motion for Judgment
on the Pleadings (Dkt. No. 51) and Plaintiffs' Motion
<u>to Treat Motion as a Motion for Summary Judgment (Dkt. 56)</u>

In 1978, the City of Indianapolis and the United States entered into, and this court approved, a Consent Decree aimed at remedying, among other things, "the present effects of promotion practices which may have adversely affected blacks in the past." That 1978 Consent Decree was in effect at all times relevant to this case. The plaintiffs here are three white Indianapolis Metropolitan Police Department lieutenants who allege the City[1] discriminated against them on the basis of race in 2006 when it promoted over them African American officers who had scored lower on the captain examination. The City denies it discriminated against these white officers, though it assumes the truth of the plaintiffs' allegation for purposes of the matter now before the court—its motion for judgment on the pleadings. The City maintains it is entitled to judgment on the pleadings because its actions were required by the Consent Decree, thus shielding it from liability for any racial preference that disadvantaged these plaintiffs in their

---

[1] The defendants are actually the City of Indianapolis, former Mayor Bart Peterson, Police Chief Michael Spears, Sheriff Frank Anderson, Monroe Gray, Jr., the Merit Board for the Metropolitan Law Enforcement Agency and its three individual members. Except when necessary to distinguish among them, this order will refer to them collectively as the "City."

efforts to gain promotion to captain. In addition, the individual defendants argue that the doctrine of qualified immunity compels judgment on the pleadings in their favor.

### Plaintiffs' Motion to Treat the City's Motion as a Motion for Summary Judgment and to Permit Discovery

Aside from responding on the merits to the City's motion for judgment on the pleadings, the plaintiffs assert as a preliminary matter that the issues presented should not be considered in the context of Fed.R.Civ.P. 12(c), but rather in the context of a Rule 56(c) motion for summary judgment. The court will address that issue first.

To bolster its motion for judgment on the pleadings, the City has referred, not only to the allegations of the plaintiffs' complaint and its answer, but to the 1978 Consent Decree, labor force data, consent decree reports, and information from a memorandum submitted in the consent decree litigation, none of which was attached to its answer.[2] The plaintiffs argue that reference to these materials requires that the court treat the City's motion as one for summary judgment. They thus seek discovery so that they can respond to the City's arguments with additional relevant materials.

Rule 12(d) provides:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

The Seventh Circuit has adopted a "relatively liberal" approach to consideration of materials in ruling on a motion for judgment on the pleadings. *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009) (permitting consideration of over 900 pages of trust and financial

---

[2] The City attached the Consent Decree (but not the other documents) to its brief in support of the motion for judgment on the pleadings.

documents attached to the answer in an ERISA action when ruling on a Rule 12(c) motion). Three factors may permit the court to consider documents technically "outside the pleadings" without converting the motion to one for summary judgment: (1) the complaint refers to the documents; (2) the documents are concededly authentic; and (3) the documents are central to the plaintiffs' claim. *Id. See also Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002).

The plaintiffs not only referred to the Consent Decree in their complaint, they quoted it. And although their claims do not "arise from" the Consent Decree, it is central to the claims and defenses in this case. Its authenticity is not disputed. The court's consideration of the Consent Decree therefore does not require that the motion for judgment on the pleadings be converted to a summary judgment motion.

The other documents to which the City has referred in its motion are different. They were not attached to the pleadings, nor were they referred to in the complaint. The City did not even submit these other documents with its motion; it merely cites data from them in its brief, apparently hoping to avoid the Rule 12(d) problem but creating a different problem (citing matters outside the record). No one has questioned their authenticity, but that is not enough to bring them within the confines of materials a court can properly consider in ruling on a motion for judgment on the pleadings. That conclusion does not, however, lead inevitably to the procedure the plaintiffs seek here. The court finds it unnecessary to consider these materials in connection with the motion for judgment on the pleadings, and it has excluded them from its consideration. The plaintiffs' motion to treat the motion for judgment on the pleadings as a motion for summary judgment (Dkt. 56) is therefore DENIED.

## **The City's Motion for Judgment on the Pleadings**

The City maintains that the Consent Decree set numeric goals for the promotion of African Americans to captain positions that it was bound to follow, thus precluding liability to the plaintiffs here for any alleged racial preferences that deprived them of promotions. The City says, in short, that it cannot be liable for doing what the "clear terms" of the Consent Decree required it to do. And building on that foundation, the individual defendants invoke qualified immunity as a complete legal bar to continued litigation against them. Dkt. 58 at 3.

The question presented by the defendants' motion for judgment on the pleadings, as well as the court's resolution of that question is, by definition, a narrow one. The standard applicable to a motion for judgment on the pleadings is similar to the standard governing a motion to dismiss under Rule 12(b)(6): whether the allegations of the complaint, if true (and in light of the affirmative defenses), state a claim upon which relief can be granted. *See, e.g., McMillan v. Collection Professionals, Inc.*, 455 F.3d 754, 757 n.1 (7th Cir. 2006). The court therefore must determine without regard to any additional facts whether, even though the plaintiffs were discriminated against on the basis of their race, their claims are nevertheless defeated on the basis of an affirmative defense (here, the Consent Decree document incorporated into the pleadings).

The primary argument in the City's opening brief in support of its motion for judgment on the pleadings is that the plaintiffs' claims depend on the contention that the goals of the 1978 Consent Decree had been met in 2006, so that the City's continued reliance on the Consent Decree to justify discrimination in connection with the promotions at issue here was not permitted. Accepting that contention, the City argues, would improperly subject the defendants to liability for a "retroactive modification in the benchmarks created by the Consent Decree."

4

*See* Dkt. 58 at 7-12. The court need not and will not address the City's argument on this point. The plaintiffs emphatically assert that this is not at all what they contend.[3]

The plaintiffs instead maintain that the "plain text of the Consent Decree prohibits Defendants from making promotion decisions on the basis of race." Dkt. 64 at 2. They further argue that the terms of the Consent Decree are so clear that the individual defendants are not entitled to qualified immunity. The court will therefore examine, not the City's primary argument, but the *premise* of that argument—that the Consent Decree by its terms required discrimination on the basis of race in the promotions at issue.

### A.  What the Consent Decree Says about Promotions

The City maintains (practically as a given) that the Consent Decree set "numeric goals" and "specifically require[d] that race be considered in decisions regarding promotions to captain." Dkt. 58 at 3. Promotions are addressed in Section IX of the Consent Decree:

> PROMOTIONS
>
> A.   Goals.
>
> In order to remedy the present effects of promotion practices which may have adversely affected blacks in the past, Defendants agree to take the following affirmative steps:
>
>   1.   As a long-term goal, Defendants agree to adopt and seek to achieve a goal of promoting blacks to the ranks of Sergeant, Lieutenant and Captain within the Police Department . . . so as to attain a percentage within those ranks which is reasonably representative of the percentage in the ranks from which promotions are traditionally made, the black percentages of which will begin to increase under the provisions of this Decree relative to the recruitment and hiring of police officers and firefighters.
>
>   2.   In order to assure the fair and equitable promotion of blacks, and because the past selection processes may have had

---

[3] In addition, that defense would likely implicate matters outside the pleadings, rendering Rule 12(c) an inappropriate vehicle for its presentation.

an adverse impact on blacks and have not been validated, no further certification for promotion to the ranks of Sergeant, Lieutenant and Captain within the Police Department shall be made from the results of promotional examinations given prior to the date of February 5, 1978.

B.     <u>Periodic Review</u>.

The written procedures for promotions shall be periodically reviewed to assure that they are maintained in such a manner that barriers that tend to discriminate against any candidates on the basis of race or color are eliminated. Copies of such written procedures and any revisions made thereto with respect to the Indianapolis Police Department shall be available for examination by the sworn personnel within the Police Department, Department of Justice, counsel for the Larkins Plaintiffs, ORS and LEAA.

* * *

C.     <u>Affirmative Action to Achieve Stated Goals</u>.

    1.     Promotions shall be based upon relevant standards and criteria which will be applied without regard to race or color.

    2.     As indicated in Sections V and VIII above, Defendant City has engaged the Jacobs Division of Planning Research Corporation to analyze, evaluate and recommend improvements for the selection process for Sergeant, Lieutenant and Captain in the Indianapolis Police Department. Additionally, Jacobs Division has attempted to develop a written promotional examination for the Indianapolis Police Department in accordance with EEOC Guidelines on Testing and FEA Guidelines on Testing, which will include test manuals and instructional manuals.

* * *

    6.     If an officer(s) within the Indianapolis Police Department on the promotional list is passed over for a promotion and an officer ranked lower on the eligibility list is promoted, the officer(s) not promoted shall be given, upon written request to the Chief of Police, the reason(s) that the officer ranked lower on the eligibility list was promoted.

>  D. <u>Interim Testing</u>.
>
>  For the purpose of developing valid promotional selection devices, the Defendants may use any interim promotional selection device of their choice so long as the results are used in a manner which is consistent with the goals set forth in Sections IX(A)(1) and (2), <u>supra</u>. However, any such promotional selection device in the Indianapolis Police Department may not be used more than one (1) time if it has an adverse effect on blacks and it is not shown to be properly validated in accordance with applicable federal guidelines.

Exhibit 1 to Dkt. 58 (Consent Decree, pp. 16-18).

The City argues that paragraph (A)(1) required it to "make race-based promotional decisions based upon the benchmarks as measured by Marion County's labor force." Dkt. 58 at 9-10. Pointing to paragraph (C)(1), the plaintiffs counter that the Consent Decree affords the City no safe harbor from liability because it expressly forbids race as a consideration in promotion decisions.

**B. The Consent Decree did not require the City to make the challenged promotions.**

The City says that paragraph (A)(1) required it to "raise the percentage of Blacks in each promoted rank of the IPD so that each eventually reflected the relevant labor force." From there, the City points out that the Consent Decree defines "relevant labor force" as the labor force of Marion County, thus creating the numerical benchmarks (from the Labor Force Data for Marion County) it was bound to achieve. Dkt. 58 at 6, 9-10. The City's position is critically flawed. First, that is not what paragraph (A)(1) *says*. It says that the long-term goal of the Consent Decree is to "attain a percentage within those ranks which is reasonably representative of the percentage in the ranks from which promotions are traditionally made, the black percentages of which will begin to increase under the provisions of this Decree relative to the recruitment and hiring of police officers and firefighters." It references not "the relevant labor force" as the

source of the representative percentage, but the "ranks from which promotions are traditionally made," i.e., the next lower rank.  Moreover, paragraph (A)(1) specifies the means by which that goal is to be attained:  by increasing through affirmative action (including numerical benchmarks) in *recruitment and hiring* the percentage of black police officers in the ranks from which promotions will be made.   The City protests that it has made promotions consistent with its interpretation of paragraph (A)(1) for many years (an evidentiary assertion outside the pleadings), but no amount of past practice can make the Consent Decree say something it doesn't say.

Second, the reading of paragraph (A)(1) the City urges would place it in irreconcilable conflict with paragraph (C)(1), which expressly excludes consideration of race in promotion decisions.  The only reasonable reading of paragraph (A)(1)—and one that is not inconsistent with paragraph (C)(1)—is an articulation of a long-term strategy of achieving representative numbers of African Americans in higher ranks as a result of the numeric goals the Consent Decree *does* create in *recruitment* and *hiring*.

Third, paragraph (A)(1) is a general recital that relies on the paragraphs that follow it for the affirmative steps to be taken to achieve its goals.  Those affirmative steps include discarding the results of invalidated promotional examinations (paragraph (A)(2)) and creating a validated examination (paragraph (C)(2)), but they do not include any "numeric goals" or specific requirements that race be considered in promotion decisions.

Relying on the addendum on page 8(A) of the Consent Decree, the City labels the plaintiffs' argument that race cannot be considered in promotions "frivolous." Dkt. 67 at 3.  But page 8(A) addresses only *hiring*, a subject distinct in the Consent Decree from *promotions*.  Indeed, throughout its briefing, the City has cited provisions of the Consent Decree that require

8

consideration of race in hiring to justify its consideration of race in making promotions. The City's contention that it is entitled to judgment on the pleadings because "the Consent Decree specifically *required* the Defendants to make race-based promotional decisions by promoting *only* the African-Americans on the then-existing promotional list and ignoring all the Caucasians" (Dkt. 67 at 3 (emphasis by City)) finds no support in the Consent Decree.[4]

Because the Consent Decree did not mandate these race-based promotion decisions, the question becomes whether the City's admitted discrimination can survive the strict scrutiny the equal protection clause requires. The City has not even suggested that it is entitled to judgment on the pleadings under this standard. And the Seventh Circuit has made clear that strict scrutiny requires an examination of the relevant facts to determine if the discrimination was necessary to rectify previous discrimination. *Billish v. City of Chicago*, 989 F.2d 890, 893-95 (7th Cir. 1993). Unless no reasonable trier of fact could doubt that the promotions were appropriate remedial measures, the matter cannot be determined without a trial. *Id*.[5] The motion for judgment on the pleadings is therefore DENIED. To be clear, the court has not undertaken to decide here whether the challenged promotion decisions pass constitutional muster; that is an issue for another day, to be presented on a more extensive record.

---

[4] The City has also argued it is protected by quasi-judicial immunity. Absolute immunity provided to judges extends to "non-judicial officials whose official duties have an integral relationship with the judicial process." *Richman v. Sheahan*, 270 F.3d 430, 436 (7th Cir. 2001). This immunity applies only to conduct directed by a judge, but not for conduct in which defendants exercised discretion to enforce an order. *Id*. at 437. Although the City has not cited any authority for extending this doctrine to a party complying with a consent decree, the court does not reject it on that basis. Rather, because the defense depends entirely on the incorrect assertion that the Consent Decree explicitly required race-based promotion decisions, the court does not address it further.

[5] *Billish* arguably would compel this result even if the Consent Decree contained promotion quotas. *See id*. at 893-94 ("Even if the measures had been required by the consent decree . . . this would not be a defense.").

### C. The individual defendants are not entitled to qualified immunity.

Having decided that the Consent Decree does not require numeric racial preferences in promotions and that the defendants are thus not entitled to judgment on the pleadings on that basis, the court turns to the question of whether the doctrine of qualified immunity nevertheless shields the individual defendants from liability.

To determine whether a defendant is entitled to qualified immunity, a court should engage in a two-step analysis. *Alexander v. City of Milwaukee*, 474 F.3d 437, 444 (7th Cir. 2007). First, the court asks whether a constitutionally protected right has been violated; if so, the court then determines whether the right was clearly established at the time of the violation. *Id*. Ordinarily, a district court should address the issue of qualified immunity at an early stage to ensure that public officials entitled to it are saved not only from ultimate liability, but also from litigation burdens. *Id.* at 443.

The assertion of qualified immunity the defendants advance in their motion is based entirely on their position that the Consent Decree required them to take race into consideration when they made the promotions at issue. They therefore frame the two-part test as follows: "whether reasonable officials in the Defendants' positions should have known in 2006 that making promotional decisions consistent with the dictates of an existing Consent Decree was unconstitutional" and whether the plaintiffs have shown "that the constitutional right to be promoted in violation of an existing Consent Decree was clearly established before 2006." Dkt. 58 at 17. Because the defendants' qualified immunity analysis is constructed on a faulty foundation, it cannot stand. The court must therefore apply the qualified immunity test based on the assumption that the promotion decisions alleged in the plaintiffs' complaint were not dictated by the language of the Consent Decree.

Race-based employment decisions are presumptively unconstitutional and will satisfy the requirements of equal protection only where consistent with strict scrutiny. *Alexander*, 474 F.3d at 444. Although a plaintiff has the ultimate burden of defeating a qualified immunity defense, it is the defendant's burden to prove that the classification satisfies strict scrutiny. *Id.* at 444-45. In order for the defendants to demonstrate that their actions pass strict scrutiny, they must demonstrate both a compelling state interest and narrowly tailored remedies consistent with that interest. *Id.* at 445. Race-conscious promotion decisions should be examined with "the *most searching form* of judicial scrutiny." *Id.* at 446. That sort of scrutiny is impossible in the context of a motion for judgment on the pleadings.

The second question is whether at the time of the challenged promotion decisions the contours of this constitutional right were not so defined as to put the defendants on notice that their conduct amounted to a constitutional violation. *Id.* In order to determine whether the law is clearly established, a court must inquire whether the unlawfulness of the conduct was apparent. *Id.* The law was clear well before 2006 that race-based preferences must be constructed carefully to discriminate no more than necessary to meet the compelling state interest is at issue. *Id.* at 447.

The facts of this case are similar to those of *Alexander*, 474 F.3d 437, in which the Seventh Circuit found that the defendants were not entitled to qualified immunity for making race-based promotion decisions. As in this case, a consent decree mandated quotas in *hiring*, but not in *promotions*. The defendants raised the qualified immunity defense in a post-trial motion after a jury verdict for the plaintiffs.

The Seventh Circuit first found that the defendants had violated a constitutional right because their race-based promotion plan was not narrowly tailored to satisfy strict scrutiny. *Id.*

at 446. The court observed that the defendants' promotion plan was "a loose and indeed effectively standard-less approach" because it did not rely on any written and uniform promotion plan and did not contain any verifiable criteria. *Id.* The court reasoned that a race-conscious promotion system with no identifiable standards that would narrowly tailor it to the specific, identifiable, compelling needs of the city cannot pass constitutional scrutiny. Thus, the court held, the defendants' actions violated the plaintiffs' constitutional rights.

In determining that the law was clearly established, the Seventh Circuit said the issue was "whether the state of the law with respect to affirmative action during the relevant period would have put a reasonable official on notice that the approach taken by the Board was unconstitutional." *Id.* at 446. It noted that the law was clear as early as 1989 that all racial classifications must satisfy strict scrutiny. *Id.* at 446-47. Satisfying strict scrutiny includes the requirement that race-based preferences be constructed carefully to discriminate no more than necessary to meet whatever compelling state interest is at issue. *Id.* at 447.

As in *Alexander*, the race-based promotion decisions here were not driven by clear, ascertainable standards in the Consent Decree. As explained above, the defendants have used the criteria explicitly reserved for consideration of race in *hiring* to justify consideration of race in promotions. Because the Consent Decree itself did not direct it, the court at this stage of the proceedings has no basis for determining that the promotion decisions challenged here (which for purposes of this motion are assumed to have included considerations of race) were narrowly tailored consistent with well-established constitutional standards.

The cases cited by the defendants to support a finding of qualified immunity are readily distinguishable because those cases involved a consent decree that specifically required the conduct at issue. *See Martinez v. City of St. Louis*, 539 F.3d 857 (8th Cir. 2008) (district court

12

could not grant monetary relief to white firefighter passed over in *hiring* when the defendants complied with a consent decree that provided 50% of the vacancies had to be filled with black applicants); *Pope v. State of Alabama*, 2008 U.S.Dist. LEXIS 56164 (N.D. Ala. July 24, 2008) (defendants were immune for complying with the express terms of a consent decree that prohibited state officials from bypassing a higher-ranked black applicant in favor of a lower-ranked white applicant).

The pleadings in this case—without more—do not compel the conclusion that the individual defendants meet the standard for qualified immunity. The motion for judgment on the pleadings on this issue is also therefore DENIED.

## Conclusion

The plaintiffs' motion to treat the motion for judgment on the pleadings as a motion for summary judgment (Dkt. 56) is DENIED. The defendants' motion for judgment on the pleadings (Dkt. 51) is DENIED. The stay of this case entered on May 13, 2009 is lifted. Counsel are ordered to confer and file a proposed Revised Case Management Plan on or before July 8, 2009.

So ORDERED.

Date: 06/24/2009

                                                    Debra McVicker Lynch
                                                    United States Magistrate Judge
                                                    Southern District of Indiana


Distribution:

Gary P. Goodin
Goodin Orzeske & Blackwell, P.C.
ggoodin@goblaw.com

John D. Meyer
Goodin Orzeske & Blackwell, P.C.
jmeyer@goblaw.com

Anthony W. Overholt
Frost Brown Todd LLC
aoverholt@fbtlaw.com

Alexander Phillip Will
Office of Corporation Counsel, City of Indianapolis
awill@indygov.org

Jonathan Lamont Mayes
City of Indianapolis, Office of Corporation Counsel
jmayes@indygov.org