UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOSEPH W. FINCH, DAVID E. HENSLEY, and PETER W. MUNGOVAN,<br><br>               Plaintiffs,<br><br>       vs.<br><br>CITY OF INDIANAPOLIS, BARTON R. PETERSON Individually and in his official capacities, MONROE GRAY, JR. Individually and in his official capacities, FRANK J. ANDERSON Individually and in his official capacities, CHIEF OF POLICE MICHAEL T. SPEARS, Individually and in his official capacities, MERIT BOARD FOR THE METROPOLITAN LAW ENFORCEMENT AGENCY, CORDELIA L. BURKS, MARY MAXWELL, and JOSEPH L. SMITH, JR. Individually and in their official capacities,<br><br>               Defendants. | No. 1:08-cv-00432-DML-RLY |

## Order on Cross-Motions for Summary Judgment

### Introduction

Plaintiffs Joseph W. Finch, David E. Hensley, and Peter W. Mungovan are police officers employed by the Indianapolis Police Department ("IPD") and later, its successor, the Indianapolis Metropolitan Police Department ("IMPD"). IMPD was created to consolidate the operations of IPD and the Marion County Sheriff's Department. In 2006, and just prior to the actual merging of substantially all the operations of IPD and the Sheriff's Department, IMPD promoted eleven police officers from lieutenant to the merit rank of captain. The plaintiffs contend that but for their Caucasian race, they would have been promoted. Their suit asserts claims for race discrimination under (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e-2(a), (2) 42 U.S.C. § 1981, and (3) the equal protection clause of the Fourteenth Amendment, enforced via 42 U.S.C. § 1983.  They also complain that the City of Indianapolis unlawfully retaliated against them in violation of Title VII for their filing of charges of race discrimination with the EEOC and their pursuit of rights under Title VII.  *See* 42 U.S.C. § 2000e-3(a).

The parties have filed cross-motions for summary judgment.  The defendants seek summary judgment on all claims, on various grounds.  The plaintiffs seek summary judgment against the City of Indianapolis on their claims under Title VII and section 1983, and against all defendants sued in their individual capacities under section 1983.

Although the parties' briefing tends to commingle the legal theories on which the plaintiffs' claims are based, the court must untangle them for proper analysis and resolution.  The plaintiffs have not responded to the defendants' arguments challenging the viability of certain claims against certain defendants, and the court can dispose of those as a preliminary matter.  For the analysis and resolution of some claims, a truncated recitation of undisputed material facts suffices, while for others—especially the claims against which a qualified immunity defense has been raised by individual defendants sued in their personal capacities—more detailed explication is necessary and the court will add those facts where necessary.

## Preliminary Matters

As noted above, some claims will be addressed only briefly—and without recitation of facts—because the plaintiffs have failed to advance evidentiary or legal support for them.

**I.   All defendants except the City are entitled to summary judgment on the Title VII claims.**

The plaintiffs' complaint asserts Title VII claims—for race discrimination and for retaliation for complaining of race discrimination—against defendant City of Indianapolis.  *See*

2

Complaint, Dkt. 1, ¶¶ 33 and 34 ("Defendant City has discriminated against [plaintiffs] . . . based upon their race . . . in violation of . . . Title VII. . . .") and ¶¶ 36 and 37 ("Defendant City has discriminated against [plaintiffs] . . . by retaliating against Plaintiffs because they filed charges of discrimination against the City with the EEOC and pursued their rights under Title VII. . . .").

Only "employers" are liable under Title VII. *Fairley v. Fermaint,* 482 F.3d 897, 903 (7th Cir. 2007). The City of Indianapolis does not dispute that because IPD and its successor IMPD are City instrumentalities, the City of Indianapolis is properly regarded as the plaintiffs' employer for Title VII purposes. But the plaintiffs' brief suggests that the City *and* the Merit Board for the Metropolitan Law Enforcement Agency ("Merit Board") are responsible for the claimed violations of Title VII (Dkt. 160 at p. 18). Their brief offers no argument or authority that the Merit Board and its members can be held separately liable to the plaintiffs under Title VII. Because the plaintiffs made no showing that the Merit Board or its members acted as the plaintiffs' employer, the Merit Board and the Merit Board members in their official and individual capacities are entitled to judgment on any Title VII claims against them. *See Thanongsinh v. Board of Education,* 462 F.3d 762, 771 n.7 (7th Cir. 2006) (Title VII imposes liability against the "employer"; a claim against a person's office is no different from a claim against the entity and is properly dismissed as duplicative).[1]

Accordingly, the court GRANTS summary judgment to all defendants except the City of Indianapolis on the plaintiffs' Title VII race discrimination and retaliation claims.

---

[1] Moreover, the court finds the plaintiffs waived any claim that the Merit Board and its members in their official or individual capacities may be found liable to the plaintiffs under Title VII. *Mink v. Barth Electric Co.,* 685 F. Supp.2d 914, 935 (S.D. Ind. 2010) (failure to develop argument results in waiver).

**II.  All defendants are entitled to summary judgment on the plaintiffs' section 1981 claims.**

Race discrimination in the terms of one's employment is prohibited under 42 U.S.C. § 1981.  *See, e.g., Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 391 (7th Cir. 2007).  With respect to section 1981, the plaintiffs' complaint makes specific allegations regarding each individual defendant and charges all "defendants" with race discrimination in violation of section 1981.  (Dkt. 1, ¶¶ 38-45).  However, the plaintiffs have completely ignored the defendants' summary judgment arguments addressed to the section 1981 claims.  Though the plaintiffs identified as an issue for the court "Are Defendants entitled to summary judgment on Plaintiffs' cause of action asserted under 42 U.S.C. §1981?" (Dkt. 160, at p. viii), their briefs never address this claim.  If there are bases upon which the plaintiffs' section 1981 claim could survive summary judgment notwithstanding the defendants' arguments, it was the plaintiffs' responsibility to assert them.  *See Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring) ("Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.").  The plaintiffs' failure to oppose the defendants' motion for summary judgment on the section 1981 claim results in judgment for the defendants on this claim.  *See Mink v. Barth Electric Co.,* 685 F. Supp. 2d 914, 935 (S.D. Ind. 2010) (party waived argument that opposing party not entitled to summary judgment on claim when party failed to respond to the opposing party's contentions and otherwise failed to address the merits of her own claim).

Accordingly, the court GRANTS summary judgment to all defendants on the plaintiffs' section 1981 claims.

### III. All defendants are entitled to summary judgment on the plaintiffs' claim that they are liable under section 1983 for violation of Title VII.

The plaintiffs also claim that all the defendants, acting under color of law, deprived them of their rights under the equal protection clause of the Fourteenth Amendment. They seek redress under 42 U.S.C. §1983, a statute that does not itself create substantive rights but provides "a means for vindicating federal rights conferred elsewhere," *Padula v. Leimbach,* 656 F.3d 595, 600 (7th Cir. 2011) (internal quotation omitted), such as the constitutional right to equal protection under the Fourteenth Amendment. Those claims will be addressed in the **Analysis** section of this Order.

The complaint also asserts, however, that plaintiffs' Title VII rights are redressable under section 1983 (Dkt. 1, ¶¶ 49, 51), but their briefing does not address how or why the Title VII claims should be evaluated in the context of section 1983. The court is not aware of any basis for changing or expanding Title VII duties, rights, or remedies by recognition of a claim under section 1983. The court will evaluate the plaintiffs' Title VII claims only under Title VII—and only against the City of Indianapolis as the employer—and not with reference to section 1983. *See Carver v. Sheriff of LaSalle County,* 243 F.3d 379, 381 (7th Cir. 2001) (Title VII claim "must proceed against the employer as an entity rather than against a natural person"); *Alexander v. Chicago Park District,* 773 F.2d 850, 855 (7th Cir. 1985) (Title VII claim cannot be brought under section 1983); *Huebschen v. Department of Health and Social Servs.,* 716 F.2d 1167, 1170 (7th Cir. 1983) (plaintiff cannot bring suit under section 1983 based on Title VII against a defendant who cannot be sued directly under Title VII).

Accordingly, the court GRANTS summary judgment to all defendants on the plaintiffs' claim that the defendants are liable *under section 1983* for violations of Title VII.

**IV. The Merit Board and individuals sued in their official capacities are entitled to summary judgment on the plaintiffs' equal protection claims.**

To the extent the plaintiffs' section 1983 equal protection claims are brought against the individual defendants in their *official* capacities or against the Merit Board, those claims are duplicative or redundant of the claim against the City and are dismissed on that basis. *See Campbell v. Town of Austin,* 2004 WL 256343 at *4 (S.D. Ind. Feb. 10, 2004) (citing *Monell v. Department of Social Servs.,* 436 U.S. 658, 690 n.55 (1978) (official capacity claim is simply another way to plead an action against the entity for which the officer is an agent and is properly dismissed as redundant when suit is brought against the entity as well).

The court will now turn to the claims and defenses that require more extensive factual and legal analysis.

## Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine dispute as to a material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. The party that bears the burden of proof on an issue may not rest on its pleadings, but must affirmatively demonstrate by designating specific facts on each essential element of its case "that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.,* 476 F.3d 487, 490 (7th Cir. 2007). Disputes about irrelevant facts do not matter; only factual disputes that might affect the outcome of the suit in light of the substantive law will prevent summary judgment. *Liberty Lobby,* 477 U.S. at 248; *JPM, Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir. 1996). Further, "the existence of some

metaphysical doubt as to the material facts is [in]sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391, 395 (7th Cir. 1997) (internal citations and quotes omitted).

The court construes the evidence, and draws all reasonable inferences from the evidence, in the light most favorable to the nonmoving party. *Zerante v. DeLuca,* 555 F.3d 582, 584 (7th Cir. 2009). When evaluating cross-motions for summary judgment, therefore, the court construes the evidence and its reasonable inferences in favor of the party against which the particular motion under consideration is made. *Metropolitan Life Ins. Co. v. Johnson,* 297 F.3d 558, 562 (7th Cir. 2002). "[I]f genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate." *Olayan v. Holder,* 833 F.Supp. 2d 1052, 1061 (S.D. Ind. 2011).

## **Undisputed Facts**

The facts recited in this section are undisputed by the parties. As the discussion below will demonstrate, the parties' cross-motions for summary judgment on the plaintiffs' Title VII claims against the City can be determined on the basis of these undisputed facts. Resolution of the equal protection claims (including qualified immunity) and punitive damages issues requires the explication of additional facts, which the court includes in section III of the **Analysis** portion of this Order.

## **Creation of IMPD**

In 2005, General Ordinance No. 110, 2005 was passed by the Indianapolis City-County Council and became law. (*See* Dkt. 161-2). The Ordinance added Chapter 279 to the Revised Code of the Consolidated City and County and established the Indianapolis Metropolitan Police Department (IMPD) through a consolidation of the two police forces within the City's

geographic boundaries—the Indianapolis Police Department (IPD) and the Marion County

Sheriff's Department.  At the time, defendant Michael T. Spears was the Chief of IPD, a position

to which he was appointed.  Defendant Frank Anderson was the Sheriff—the head of the

Sheriff's Department—an office to which he was elected by voters.

Under the Ordinance, the two police forces were to begin coordinating their financial and

purchasing operations through IMPD effective January 1, 2006, and were to provide law

enforcement, as IMPD, for the City effective January 1, 2007.  (Section 279-102).  Effective

after December 31, 2006, all IPD officers and all county sheriff deputies became members of

IMPD.  (Section 279-103(a)).  Merit promotions lists for the separate police forces were deemed

to have expired effective January 1, 2006, and the two departments were directed to engage in

"joint promotional processes for all merit ranks" before January 1, 2007.  (Section 279-104(a)).

The Ordinance created a "Transition Authority" to, in general, plan and oversee the

consolidation of the two police forces.  (Section 279-201).  The Transition Authority had three

members—the Sheriff (defendant Frank Anderson), the Mayor (defendant Bart Peterson), and

the President of the City-County Council (defendant Monroe Gray, Jr.).  A transition advisory

committee, composed of 15 members, was established, as well as a 43-member steering

committee, to address consolidation issues and to make recommendations to, and carry out

directions from, the Transition Authority.  (Sections 279-203, -204, -205).

**The 2006 Promotion Process**

IPD and the Sheriff's Department had differing merit ranks.  Within IPD, the rank of

captain—the rank just above lieutenant—was a merit rank, while in the Sheriff's Department, the

rank of captain was an appointed rank.  (Spears Dep., Dkt. 161-8, p. 92, lines 17-22 (regarding

IPD ranks) and p. 32, lines 10-18 (regarding Sheriff's Department ranks)).  In anticipation of the

8

combined police force as IMPD, and in anticipation of promoting officers from the rank of

lieutenant to the rank of captain, a joint promotional process for officers from IPD and the

Sheriff's Department—competing against one another for promotion—was established and

approved by the merit boards of IPD and the Sheriff's Department.  (*See* Dkt. 161-25, minutes of

8/26/2006 joint meeting of IPD and Sheriff's Department merit boards).  The 2006 promotion

process included written testing materials, oral interviews, and consideration of background

factors such as a college degree or military service, all of which were approved by the merit

boards.  (*Id)*.

Fifty-two lieutenants from IPD and the Sheriff's Department completed the applications,

examinations, and interviews necessary to be considered for the 2006 captain promotions, and an

eligibility list for promotion was created.  The eligibility list ranked the 52 officers from highest

to lowest in their overall scoring.  (*See* Dkt. 161-9, eligibility list reflecting scoring on all facets

of 2006 promotion process).

Under Section 253-207 of the City's Code (Dkt. 161-1), which was applicable at the

time, the Chief of IPD was responsible for making promotions with the approval of IPD's five-

member civilian merit board.  Section 253-207 states in relevant part:

> Promotions shall be made by the chief of police with the approval
> of the merit board. Such promotions shall be made to position vacancies
> identified by the chief of police and designated to be filled by the chief
> and the director of public safety.  In making final selections for promotion,
> the chief shall promote the candidate receiving the highest promotion
> score who, in the opinion of the chief and the merit board, is best qualified
> for the position.

All promotions to the ranks of sergeant, lieutenant and captain shall be made in accordance with this merit system, without regard to the candidate's political party preference or activities.

(Section 253-207(j), (k)).[2]

### Chief Spears's Promotion Recommendations and Their Approval

IPD Chief Michael T. Spears determined eleven promotions to the merit rank of captain should be made, based on various anticipated personnel needs for IMPD (Spears Dep., Dkt. 161-8, p. 69, line 17 to p. 73, line 8), and at a December 14, 2006 meeting of the IPD Merit Board, Chief Spears recommended eleven officers for those promotions.  (Minutes of 12/14/06 merit board meeting, Dkt. 161-23 at p. 5).   He made the same recommendations to the Transition Authority at a public meeting held December 19, 2006.  (Transcript of 12/19/2006 Transition Authority meeting, Dkt. 161-16 at p. 5).

Chief Spears's recommendations were not all in the rank order provided on the eligibility list.  Chief Spears recommended for promotion the candidates ranked one through seven on the list, all of whom were white males and one of whom was a sheriff's deputy.  (Dkt. 149-21).  At that point, Chief Spears deviated from rank order.  Candidate number eight was twelfth on the eligibility list, an African American, and Chief Spears chose him "pursuant to the consent decree."  (*Id.*).  Candidate number nine was ranked thirteenth on the eligibility list, was a sheriff's deputy and is white, and Chief Spears chose him based on a provision of City Code Section 279-104 (creating IMPD) setting a goal "of proportional representation of former police officers and sheriff's deputies throughout the divisions and appointed ranks" of the new IMPD. Candidate number ten was seventeenth on the eligibility list, was a sheriff's deputy and African

---

[2]      Under the Ordinance creating IMPD, this five-member civilian merit board for IPD and the Sheriff Department's merit board were to be abolished and their duties transferred to and assumed by a new seven-member merit board for IMPD effective January 1, 2007.  (Section 279-232, Dkt. 161-2).

American, and Chief Spears chose him "pursuant to the consent decree as well as" the proportional representation goal for former sheriff deputies in the new IMPD as provided in Section 279-104.  (*Id.*).  Finally, candidate number eleven was twenty-sixth on the eligibility list, an African American, and Chief Spears chose him "pursuant to the consent decree."

The consent decree, a court order entered by Judge James Noland of this Court on July 19, 1978, was entered by the City and the federal government to settle a lawsuit by the United States against the City, various agencies, and City officials to redress race discrimination within the Indianapolis police and fire departments.  (Dkt. 149-1, hereafter "Consent Decree").[3]  The Consent Decree was viewed by many within the City and IPD as either requiring or permitting the Chief of IPD to make recommendations for promotion out-of-rank order for the benefit of officers of African American race and based on and because of their race.  (E.g., Spears Dep., Dkt. 161-8, p. 28, lines 3-8, p. 29, lines 1-12, p. 49, line 15 to p. 50, line 2; Minutes of 10/21/2004 IPD merit board meeting, Dkt. 149-14 at pp. 57-61).  (That view, as addressed in more detail later in this entry, was erroneous at least as of, and in connection with, the 2006 promotions at issue in this case.)

The plaintiffs here were ranked eighth (Mr. Hensley), ninth (Mr. Finch), and tenth (Mr. Mungovan) on the eligibility list.  (*See* Dkt. 149-20).  The parties do not dispute that had Chief Spears followed rank order in his recommendations, these men would have been promoted to captain as part of the 2006 promotions.  The parties also do not dispute that Chief Spears's recommendations for at least three of the promotions that were made—the officers that were

---

[3]     The City also points out that a second Consent Decree (Consent Decree II) was agreed by the United States and the City, and entered by the Court, to address allegations of gender discrimination within the City's police and fire departments.  Consent Decree II is not an issue in this case.

ranked twelfth, seventeenth, and twenty-sixth—took into account the officers' race as a deciding factor in favor of their promotions. The Merit Board, by a 3 to 2 vote, approved Chief Spears's recommendations. (Dkt. 161-23). The three members who approved the recommendations are defendants Cordelia L. Burks, Mary Maxwell, and Joseph L. Smith, Jr. *Id.* The three members of the Transition Authority—defendants Mayor Peterson, Sheriff Anderson, and City-County Council President Monroe Gray, Jr.—ratified Chief Spears's recommendations. (Dkt. 161-16 at p. 5).

## Analysis

Remaining for the court's summary judgment evaluation are (1) the plaintiffs' Title VII discrimination and retaliation claims against the City, on which both the plaintiffs and the defendants seek summary judgment; (2) the plaintiffs' section 1983 claims against the City and all individual defendants (in their individual capacities) for violating the plaintiffs' rights to equal protection secured by the Fourteenth Amendment, on which both the plaintiffs and the defendants seek summary judgment; and (3) the plaintiffs' request for punitive damages, on which the defendants seek summary judgment.

### I.  The plaintiffs are entitled to summary judgment against the City on their claims for race discrimination under Title VII.

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ." 42 U.S.C. § 2000e-2(a)(1).

This case is quite unlike most Title VII race discrimination cases that require detailed elucidation of the evidence under the *McDonnell Douglas* direct and indirect methods of proof to "sharpen" the analysis "into the elusive factual question of intentional discrimination." *Coleman*

*v. Donahoe,* 667 F.3d 835, 845 (7th Cir. 2012) (addressing prima facie case of discrimination under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)).

Here, the City admits that Chief Spears's promotion recommendations, which were approved and effected, were race-conscious.  At least three candidates for promotion to captain were promoted ahead of plaintiffs Hensley, Finch, and Mungovan because they are African American.  Stated another way, had the plaintiffs been African American, they would have been promoted to captain.

The City's defense to liability under Title VII is that it was permitted (or more precisely, according to the City, required) by the Consent Decree to skip over plaintiffs Hensley, Finch, and Mungovan, and make instead "affirmative action" promotions from lieutenants to captains based on race.  The City argues that its racially discriminatory conduct falls within a "safe harbor" from discrimination claims provided in the Consent Decree.[4]  It also argues the general proposition, with some support in the case law, that where a person's actions were mandated by court order, such as a consent decree, damages liability should not result even if that conduct is

---

[4]      The City cites to language within the Consent Decree that "[r]emedial actions and practices required by the terms or permitted to effectuate and carry out the purposes of this Decree shall not be deemed discriminatory within the meaning of 31 U.S.C. §1221 *et seq.*, and 42 U.S.C. §3701 *et seq.*"  However, these statutory references are to laws other than Title VII.  They are references to the State and Local Fiscal Assistance Act of 1972 (31 U.S.C. §1221 *et seq.*) and the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. §3701 *et seq.*), and authorized the United States Attorney General to bring a civil action against a unit of local government receiving federal funds to redress discrimination "on the ground of race, color, national origin, or sex."  *See United States v. City of Philadelphia,* 644 F.2d 187, 203 n.24 (3[d] Cir.1980) (quoting portions of and describing these statutes' anti-discrimination provisions). The anti-discrimination provision of the Crime Control Act is currently codified at 42 U.S.C. §3789d(c)(1).  The court's research indicates that the State and Local Fiscal Assistance Act of 1972, a program under which Congress made revenue grants to state and local governments tied to anti-discrimination obligations, was repealed in the mid-1980s.  *See Council of and for the Blind of Delaware County Valley, Inc. v. Regan,* 709 F.2d 1521, 1523-24 (D.C. Cir. 1983) (describing history of this legislation and its anti-discrimination provisions); *Samish Indian Nation v. United States,* 90 Fed. Cl. 122, 133 n.11 (Fed. Cl. Ct. 2009) (noting the repeal of the Act in 1985).

later found unlawful.  The court rejects these arguments for the same reasons it did earlier in this case.  (*See* Dkt. 76).  That is, the defense proceeds from an erroneous premise that the Consent Decree required (or permitted) race-based promotion decisions.  As this court and the Seventh Circuit previously held in this case, the plain language of the Consent Decree required promotions to be made "without regard to race or color."  *Finch v. City of Indianapolis,* 2009 WL 1797865 (S.D. Ind. June 24, 2009), *aff'd sub nom Finch v. Peterson,* 622 F.3d 725 (7th Cir. 2010).  As explained below, the City's new arguments do not alter those conclusions.[5]

**A. The Consent Decree did not mandate, or permit, race-based promotions.**

  1. The 1978 Consent Decree was supported by evidence of past discriminatory impact.

Although as part of the 1978 Consent Decree, the City did not admit any past intentional practice or policy within IPD (or the Fire Department) to discriminate against blacks,[6] the evidence demonstrated discriminatory impact.  The racial composition of the City and Marion County workforce[7] was approximately 16-17% black, according to 1970 U.S. census figures,

---

[5]      The parties devote a significant amount of their briefing to whether the City's Consent Decree defense is barred under collateral estoppel principles (based on an interlocutory decision on summary judgment in *Scott v. City of Indianapolis,* 2011 WL 4625727 (S.D. Ind. Sept. 29, 2011), or the law of the case doctrine because of the Seventh Circuit's ruling earlier in this case. The court does not reach these arguments because, even without applying collateral estoppel (which would not be appropriate to apply to a non-final decision anyway) or the law of the case doctrine, the court rejects on their merits the new arguments advanced by the City to bolster its Consent Decree defense.

[6]      At the time, under common vernacular, the race of persons of African American heritage was referred to as black.  The term, viewed by some as inappropriately and inaccurately referencing the color of a person's skin, has yielded to the more common term "African American."  This Order uses the term "black" or "blacks" sometimes in its discussion of the Consent Decree because those are the terms used in the Consent Decree itself.

[7]      At the time, police officers were required by statute to live within Marion County, which encompassed the City limits as well.

14

while the percentage of black police officers within IPD ranged from only 8.9% to 11.3% in the

years 1972 through 1978.[8]  In addition, from 1972 through May 1977, IPD had hired a total of

216 officers but only 27 of them were African American—with most of the African Americans

(20 of the 27) hired between February 1976 and May 1977.  (*Id.,* Stipulation of Facts, ¶ 8).

Written examinations that IPD used for selecting officers for promotions had never before been

validated in accordance with EEOC or Department of Justice guidelines.  *Id.*, ¶ 9.  Testing results

indicated a disparate impact for test failure for black officers.  Actual promotions also showed

disparate impact against black officers.  Data from 1972-1975 promotions to sergeant showed

that 66% of black officers taking the promotion tests failed (compared to 33% of whites).  *Id.,*

10.  Of all promotions to sergeant in this period, 95% of the promotions (108 out of 114

promotions made) were of white officers and 5% (six total) were black officers.  *Id.*, ¶ 10.  The

1972-1975 data for promotions from sergeant to lieutenant showed that 63% of black officers

taking the promotions tests failed them (compared to 44% of the white officers).  *Id.,* ¶ 11.  Of all

promotions to lieutenant during this period, 97% of the promotions (34 out of 35 promotions

made) were of white officers; only one black officer (representing the remaining 2.86% of 35)

was promoted to lieutenant.  *Id.*

> 2.  The Consent Decree's guidelines for recruitment and hiring are separate from those that apply to promotions.

The 1978 Consent Decree treats the City's obligations for the "Recruitment and Hiring"

of IPD officers separately from "Promotions" of IPD officers.

---

[8]      *See* Stipulation of Facts, dated June 29, 1978, agreed to by the federal government and the City in support of the Consent Decree, Dkt. 149-1 at pp. 44-49.  Between 1972 and 1978, the number of sworn personnel employed by IPD was about 1100 annually; the number that were black ranged from 99 to 126 persons.  Consistently in these years, about 90% of the police force—or about a thousand of the officers—were white.  *Id.* ¶ 6.

a.   Recruitment and Hiring

Recruitment and Hiring are addressed in Section IV, which required the City to take certain affirmative steps "to remedy the present effects of hiring practices which may have adversely affected blacks in the past."  (Section IV.A.).   In addition to taking affirmative steps to improve and establish an image of IPD within the black community as an attractive employer that does not discriminate against blacks, and to actively recruit blacks to apply to become officers, the City agreed to "appoint, subject to the availability of qualified black applicants, at least twenty-five percent (25%) blacks to all future training classes of [IPD] until" the long-range goal that the number of black officers "more nearly reflects the racial and ethnic composition of the work force of the City of Indianapolis (Marion County) as a whole" is achieved.  (Section IV.A.1-2).  The 25% mandate was subject to renegotiation *upward* if the City did not make appreciable progress in achieving the long-range goal that the percentage of black officers coincide with the racial composition of the Marion County work force, as measured from time to time.  (Section IV.A.3, 5).  There is no evidence that the 25% quota applicable to IPD training classes was ever revised upward.

b.   Promotions

Promotions are addressed in Section IX of the Consent Decree.  The City agreed to take certain affirmative steps to "remedy the present effects of promotion practices which may have adversely affected blacks in the past."  But contrary to the City's obligations for recruitment and hiring, promotions were to be made "based upon relevant standards and criteria which will be applied *without regard to race or color*."  (Section IX.C.1; emphasis added).  The "long-term goal" that blacks would be promoted in percentages "reasonably representative" of their percentages in the ranks from which promotions are made was expected to be achieved naturally as the barriers to promotion were removed (such as by the adoption of race-neutral testing, and

16

the wide-availability of skills training, and educational and work assignment opportunities) and over time as the number of blacks recruited, and then hired, as police officers in the first place increased as a result of the Decree's mandates on recruitment and hiring. *Id. See Finch,* 622 F.3d at 730 (describing the Consent Decree's logical framework for increasing the number of African American officers in the ranks of sergeant, lieutenant, and captain, while prohibiting race-based decisions for promotions).

The terms of the Consent Decree regarding promotions are central to this case. Section IX reads:

PROMOTIONS

A. Goals.

In order to remedy the present effects of promotion practices which may have adversely affected blacks in the past, Defendants agree to take the following affirmative steps:

1. As a long-term goal, Defendants agree to adopt and seek to achieve a goal of promoting blacks to the ranks of Sergeant, Lieutenant and Captain within the Police Department [and to certain ranks within the Fire Department][9] so as to attain a percentage within those ranks which is reasonably representative of the percentage in the ranks from which promotions are traditionally made, the black percentages of which will begin to increase under the provisions of this Decree relative to the recruitment and hiring of police officers and firefighters.

2. In order to assure the fair and equitable promotion of blacks, and because the past selection processes may have had an adverse impact on blacks and have not been validated, no further certification for promotion to the ranks of Sergeant, Lieutenant and Captain within the Police Department shall be made from the results of promotional examinations given prior to the date of February 5, 1978.

B. Periodic Review.

The written procedures for promotions shall be periodically reviewed to assure that they are maintained in such a manner that barriers that tend to discriminate against

---

[9]     As previously noted, the Consent Decree addressed hiring and promotions within the Indianapolis Fire Department as well as IPD.

any candidates on the basis of race or color are eliminated.  Copies of such written procedures and any revisions made thereto with respect to the Indianapolis Police Department shall be available for examination by the sworn personnel within the Police Department, the Department of Justice, counsel for the Larkins Plaintiffs, ORS and LEAA.

The same information shall be available for examination by the sworn personnel within the Fire Department, the Department of Justice and ORS for the Indianapolis Fire Department.

C.  <u>Affirmative Action to Achieve Stated Goals.</u>

1.  Promotions shall be based upon relevant standards and criteria which will be applied without regard to race or color.[10]

2.  As indicated in Sections V and VIII above, Defendant City has engaged the Jacobs Division of Planning Research Corporation to analyze, evaluate and recommend improvements for the selection process for Sergeant, Lieutenant and Captain in the Indianapolis Police Department.  Additionally, Jacobs Division has attempted to develop a written promotional examination for the Indianapolis Police Department in accordance with EEOC Guidelines on Testing and FEA Guidelines on Testing, which will include test manuals and instructional manuals.

3.  Defendants shall provide counseling at regular intervals to any officer who desires to apply for promotion to a position which requires additional training and skill development.  Such counseling shall inform the officer as to necessary additions to his or her skill and experience which are required for such promotion or advancement.

4.  Defendants shall notify all sworn personnel in the Indianapolis Police and Fire Departments, by posting at the Personnel Branch bulletin board, information concerning the availability, time and procedure for application, and the criteria for selection of personnel for enrollment in special courses, classes, training or instruction in any areas of specialization or job skills.  Such notice shall be posted at least two (2) weeks prior to the last date of application for any such opportunities.

---

[10]     Similarly, Section VIII.A., titled Classification and Evaluations, provides that the City "will not limit, segregate or classify their employees in a way which would deprive any individual of employment opportunities, or otherwise adversely affect his or her status as an employee with respect to *promotions,* job assignments or responsibilities or any other terms, conditions, privileges of employment *because of such individual's race or color."*  (emphasis added).

    5.  Defendants shall give written notice by mail to all eligible personnel of the date when any promotion examination is scheduled and the deadline for application for such examination.

    6.  If an officer(s) within the Indianapolis Police Department on the promotional list is passed over for a promotion and an officer ranked lower on the eligibility list is promoted, the officer(s) not promoted shall be given, upon written request to the Chief of Police, the reason(s) that the officer ranked lower on the eligibility list was promoted.

D.  <u>Interim Testing</u>.

For the purpose of developing valid promotional selection devices, the Defendants may use any interim promotional selection device of their choice so long as the results are used in a manner which is consistent with the goals set forth in Sections IX(A)(1) and (2), *supra*. However, any such promotional selection device in the Indianapolis Police Department may not be used more than one (1) time if it has an adverse effect on blacks and it is not shown to be properly validated in accordance with applicable federal guidelines.

    3.  <u>The promotion provisions of the Consent Decree were construed earlier in this case, both by this court and by the Seventh Circuit.</u>

In earlier proceedings in this case, the defendants moved for judgment on the pleadings on the ground that the Consent Decree required the City to take race into account in promoting over the plaintiffs African American officers who were ranked lower than the plaintiffs on the eligibility list. The defendants asserted that the City's "compliance" with the Consent Decree shielded the City from liability, as well as the individual defendants under the doctrine of qualified immunity. This court rejected the defendants' arguments because, as shown above, the Consent Decree *does not* require the City to consider race in making promotions decisions, but rather expressly excludes consideration of race in those decisions. *Finch v. City of Indianapolis,* 2009 WL 1797865 (S.D. Ind. June 24, 2009) (Dkt. 76). The court's denial of qualified immunity was immediately appealable, and the individual defendants appealed.

The Seventh Circuit affirmed this court's decision, also concluding that "Nothing in [the 1978 Consent Decree] required [city officials] to take race into consideration in making

19

promotions.  To the contrary, specific language in the decree required promotions within the

Police Department to be made without regard to race or color."  *Finch v. Peterson,* 622 F.3d 725,

726 (7th Cir. 2010).  The Seventh Circuit also rejected the defendants' argument that to effectuate

the Consent Decree's overall goals and purposes to increase the number of African Americans

throughout all levels of IMPD, city officials were at least permitted by the Decree to take

remedial actions influenced by racial considerations in making promotions.  The court stated:

"Properly understood, Subsection IX, read as a whole, operates to prohibit so-called 'race-

norming' in promotions."  *Id.* at 730.

        4.  <u>There is no persuasive basis for revisiting the construction of the promotion<br>provisions of the Consent Decree.</u>

            a.  The 1996 and 1997 decisions in *Black* do not persuade the court to revisit<br>the meaning of the Consent Decree.

The City (and the other defendants) ask the court to revisit its construction of the Consent

Decree, asserting there is "new evidence" that was not previously considered by this court or the

Seventh Circuit that should change the conclusion that the Consent Decree excluded race or

color as a factor in promotions.  They point to two orders in *Black v. City of Indianapolis,* Case

No. IP 95-0453-LJM, in which Judge McKinney addressed cross-motions for summary judgment

in a case where, like this one, white male IPD officers challenged the City's failure to promote

them as unlawful under Title VII because the City promoted instead African American (and

female) officers who ranked beneath them on the applicable promotions eligibility list because of

those officers' race (or sex).[11]  Because of the defendants' heavy reliance on *Black,* this court

provides a detailed discussion of those decisions.

---

[11]    The two orders, one dated July 23, 1996, and the second one dated March 18, 1997, are at
Dkt. 149-5 and 149-6, respectively.

The promotions at issue in *Black* were of police patrol officers to the merit rank of sergeant and took place in January 1993.  The City conceded—as it does in this case—that its promotion of African American officers instead of the higher-ranking Caucasian plaintiffs were "affirmative action" promotions made because of the Consent Decree, and to meet the Consent Decree's goals and remedy a racial imbalance within IPD's supervisory ranks.  (*See* Dkt. 149-5 at p. 4; Dkt. 149-6 at pp. 2-3).  The orders in *Black* treated the Consent Decree as an affirmative action plan that permitted race-motivated promotion decisions for purposes of Title VII only (but significantly not the equal protection clause)[12] so long as the plan and its implementation in particular circumstances satisfied requirements announced by the Supreme Court in *Johnson v. Transportation Agency,* 480 U.S. 616 (1987).

In the first *Black* order ("*Black I*"), the court found that under *Johnson,* a race-based employment decision made according to an affirmative action plan does not violate Title VII if at the time of the decision there existed "a manifest racial imbalance" and if the rights of nonminority employees were not "unnecessarily trammeled."  (Dkt. 149-5 at pp. 9-12).  The court determined that the record lacked sufficient information to evaluate the fairness of the Consent Decree as applied in the 1993 promotions to nonminorities and lacked the necessary statistical data to make the kind of "focused statistical analysis" required to decide whether a manifest racial imbalance existed.

The City then submitted a supplemental motion for summary judgment to supply the kind of record evidence found lacking in *Black I*, and in the second *Black* order ("*Black II")* the court granted summary judgment to the City.  In *Black II*, the court did not revisit the "undisputed

_____

[12]     In *Black I,* the court ruled that the plaintiffs did not challenge the failure to promote them as unlawful under the equal protection clause of the Fourteenth Amendment, and therefore declined to evaluate the City's actions under the strict scrutiny standard applicable to race discrimination challenged as unconstitutional.  (Dkt. 149-5 at pp. 7-8).

facts" discussed in *Black I* and incorporated them as an underlying basis for the second order. (Dkt. 149-6 at p.1).  The court stated that the Consent Decree required the City to undertake certain affirmative action in recruiting, hiring, and promoting minority officers, and highlighted the following language from the Consent Decree as particularly relevant:  "[The] Consent Decree explicitly requires the City 'to adopt and seek to achieve a goal of promoting blacks to the ranks of Sergeant, Lieutenant and Captain within the Police Department . . . so as to attain a percentage within those ranks which is reasonably representative of the percentage in the ranks from which promotions are traditionally made. . . .'  Consent Decree I, ¶ IX, A, 1."  (Dkt. 149-6 at p. 2, ellipsis as in original).

The court evaluated the City's new statistical evidence within the *Johnson v. Transportation Agency* framework it had discussed in *Black I.*  To determine whether a manifest racial imbalance existed, the court compared the percentage of African American officers in the pool of officers eligible for promotion to sergeant to the percentage of African American officers that had the rank of sergeant at the time of the January 1993 promotions at issue.[13]  Its analysis showed that in January 1993, 23% of patrol officers eligible for promotion to sergeant were African Americans, while only 16% of current sergeants were African Americans, suggesting "that the City has not yet attained the racial balance contemplated by the 1978 Consent Decree." (Dkt. 149-6 at p. 5).  Ultimately, the court decided that "the City did not violate the standard from *Johnson* by considering race and gender in conjunction with the 1993 promotions" and was thus entitled to judgment on the plaintiffs' Title VII claims.  (Dkt. 149-6 at p. 8).

---

[13]      In *Black I* and *Black II,* the court emphasized that under *Johnson* the relevant statistical analysis in a promotions case is a comparison between the racial characteristics of the labor pool qualified for promotion and the racial characteristics of the labor force occupying the job to which promotions were made.  (*See* Dkt. 149-5 at pp. 10-12; Dkt. 149-6 at pp. 5 and 7).

The City contends that the two *Black* decisions control the City's use of the Consent Decree for promotions, so that if considering race in promotion decisions was permitted under *Black,* then necessarily the City could make race-conscious decisions in 2006 under the auspices of the Consent Decree without running afoul of Title VII.  Other than labeling the decisions in *Black* as a "judicial mandate," however, the City does not offer any legal basis for requiring the court to reach the same conclusions under these facts and claims as the *Black* court reached under the facts and law presented there, and the court perceives none.  Certainly neither *Black* decision purported to or did alter any provision of, or otherwise amend, the Consent Decree.[14]

The fundamental reason this court rejects the defendants' assertion of *Black* as a justification for the City's 2006 "Consent Decree promotions" is that the decision *does not address* the provision of the Consent Decree requiring promotions to be made without regard to race.  Conspicuously missing from the orders in *Black I* and *Black II* and their discussion of the terms of the Consent Decree is the language of Section IX.C.1 that "Promotions shall be based upon relevant standards and criteria which will be applied without regard to race or color."  It is that language that forecloses any argument that the Consent Decree can be viewed as an affirmative action plan permitting consideration of race as a factor in promotions in certain circumscribed situations consistent with Title VII and under the principles of *Johnson v. Transportation Agency,* 480 U.S. 616 (1987).[15]  An undisputed fact upon which summary

---

[14]     The court also finds it necessary to comment on the defendants' characterization of the opinions in *Black* as *mandating* the City to make race-conscious promotion decisions.  There is absolutely *nothing* in the *Black* decisions that requires the City to make any particular employment decision, let alone one that is racially discriminatory.

[15]     *Johnson* may no longer be good law.  In *Hill v. Ross,* 183 F.3d 586 (7th Cir. 1999), the Seventh Circuit questioned *Johnson's* continued viability at least where race or sex is used as "an independently dispositive criteria" for an employment decision as opposed to one factor in "a more complex calculus."  *Id.* at 588.  Moreover, in *Ricci v. DeStefano,* 557 U.S. 557 (2009), the

judgment must be decided in *this* case is the language of Section IX.C.1, and that language was not construed, applied, or even addressed in *Black*.

This court does not know why the language in Section IX.C.1 was not addressed in the *Black* decisions. But it surmises that the parties never mentioned this language and failed to bring it to Judge McKinney's attention. In this very case, the defendants' comprehensive briefing regarding the Consent Decree to support their motion for judgment on the pleadings (*see* Dkts. 52, 58, and 67) never mentioned that the Consent Decree required promotions to be based on relevant standards applied "without regard to race or color" and did not bring it to this court's attention. The plaintiffs' opposition briefing did point to this language (Dkt. 64 at pp. 2-3), but, strangely, the defendants' reply brief continued to ignore the language of Section IX.C.1. (*See* Dkt. 67).[16]

Courts must generally rely on the parties before it to articulate the relevant facts, discuss applicable law, and argue the application of the law to the facts. When parties do not bring particular facts to a court's attention—such as relevant provisions of the Consent Decree—a court understandably may not address them. The defendants cannot rely on *Black* as authority on an issue that was not raised and litigated by the parties or addressed by the court. [17]

_____

Supreme Court narrowly confined an employer's ability under Title VII to make a race-based decision to ameliorate the adverse impact of an otherwise race-neutral procedure. Even if the Consent Decree had permitted race as one factor in promotions, it is questionable whether the 2006 promotions could have been considered lawful under Title VII. Under *Ricci,* an employer cannot make a race-based decision unless "there is a strong basis in evidence" that it otherwise would be subject to disparate impact liability. 557 U.S. at 583.

[16]     The City also did not even mention the *Black* decisions until the defendants' summary judgment briefing.

[17]     At several places in their brief, the defendants claim it would be unfair for this court to conclude that *Black* was wrongly decided and "retroactively impose damages" as a result. A party cannot neglect to reveal pertinent facts to a court and then later claim that the court

      b.  DOJ's "acquiescence" in prior race-based promotions does not alter the language of the Consent Decree or the result here.

The defendants also argue that the Department of Justice acquiesced in a view that the Consent Decree permitted the City to make affirmative action promotions based on race.  But even if this were true (and there is insufficient evidence to accept it as true),[18] the defendants do not provide any legal basis on which the court could construe the Consent Decree contrary to its plain language because of some long-standing acquiescence or understanding by DOJ and the City that the Consent Decree means something different from what it actually says.  After all, the Consent Decree is a court order; any amendment or other alteration in the language of the Decree required an order from the court.  That was not done until August 2008, well after the 2006 promotions at issue in this case, when the court granted the City's and DOJ's joint motion to dissolve the Consent Decree.  (Dkt. 149-2).

---

somehow absolved them from liability under those facts.  And to the extent the plea is made by the individual defendants, they ignore that *Black* expressly declined to evaluate whether the 1993 promotions at issue could satisfy strict scrutiny required in assessing equal protection claims, and that is the only basis on which the individual defendants are exposed to damages liability in this case.  Thus, even if the individual defendants knew of the *Black* decision, they could not have reasonably believed it protected them from an equal protection claim.

[18]     The City has presented no evidence that DOJ knew the City had routinely made race-based promotions of African American officers over Caucasian officers ranked higher on a promotions eligibility list.  The City asks the court to draw the inference that DOJ knew this because under the Consent Decree's reporting obligations, the City provided periodic reports to DOJ, including final promotions lists from which DOJ could determine the names of the persons promoted, their race and gender, and their rank order on a corresponding promotion eligibility list.  (*See* Dkt. 150 at pp. 7-8; Affidavit of Ellen Gabovitch, Dkt. 149-7, ¶¶ 18-20).  Merely knowing that an officer who is African American was promoted out-of-rank order on a promotion eligibility list does not mean the officer was promoted because of his race or to remedy a perceived racial imbalance in the promoted rank.  As the City acknowledges, officers are not entitled to be promoted in the order of an eligibility list, and the Chief of Police and the Merit Board enjoy some discretion in determining the best qualified officers for promotion (*see* Gabovitch Aff., ¶¶ 6-8)—so long as, of course, their discretion is not grounded in unlawful discrimination.  The City also argues that DOJ never challenged the interpretation of the Consent Decree the City had advanced in *Black* (Dkt. 150 at p. 8)*,* but the City has not shown that the DOJ even knew of its arguments in *Black* or of its failure to cite relevant language of the Consent Decree.

In sum, neither the two decisions in *Black* nor DOJ's purported acquiescence in the City's long-standing race-based promotional practices change the undisputed fact and legal conclusion that: "Nothing in [the 1978 Consent Decree] required [city officials] to take race into consideration in making promotions. To the contrary, specific language in the decree required promotions within the Police Department to be made without regard to race or color." *Finch,* 622 F.3d at 726. Moreover, as the Seventh Circuit affirmed in this case, that specific language applies to "reverse" discrimination against Caucasians and discrimination against African Americans (and any other race for that matter). The City's argument—timidly advanced in a footnote (Dkt. 150 at pp. 20-21 n.8)—that Section IX.C.1's proscription of race-based decisions in promotions applies only to discrimination against African Americans and not against Caucasian officers, is groundless. There is no textual, logical, or legal support for that argument, and it runs afoul of this court's and the Seventh Circuit's decisions in this case.

Because the Consent Decree did not permit or require the City to engage in race-based discrimination in its promotion decisions, and because the City has no other defense to its admitted race discrimination in the promotion decisions affecting plaintiffs Finch, Mungovan, and Hensley, the City is liable as a matter of law to the plaintiffs on their claims for race discrimination under Title VII. The plaintiffs' remedies under Title VII remain to be determined at trial.

## II. The City's motion for summary judgment on the Title VII retaliation claims of plaintiff Finch must be denied; it is entitled to summary judgment on the retaliation claims of plaintiffs Hensley and Mungovan.

Title VII also prohibits retaliatory action against an employee because he has brought a charge of race discrimination or participated in any proceeding under Title VII. 42 U.S.C. 2000e-3(a); *Silverman v. Board of Education of City of Chicago,* 637 F.3d 729,740 (7th Cir.

2011) ("Title VII prohibits an employer from taking an adverse employment action against an employee because she has filed an employment discrimination charge.").

The City seeks summary judgment on the Title VII retaliation claims because the plaintiffs did not include them in their EEOC charges.  The court will address this argument only in the context of Finch's retaliation claim.  Plaintiffs Hensley and Mungovan have failed to advance any factual basis for their retaliation claims (if in fact they intended to pursue them).  That leaves the court no basis on which to find that their retaliation claims would meet the exception to the exhaustion requirement discussed below.  The defendants are therefore granted summary judgment on the Title VII retaliation claims of Hensley and Mungovan.

Plaintiff Finch asserts that after filing his January 2007 EEOC charge complaining of the City's failure to promote him in December 2006 (*see* Dkt. 149-31 at p. 2), he suffered retaliation by being transferred from an IT position for no apparent reason, by later being transferred to a position in which he seemingly was given no authority, by having his disciplinary authority over another officer ignored, and by being denied the benefit of a new police car.  (*See* Dkt. 160 at p. 67).

Title VII claims are subject to an administrative exhaustion requirement, and a plaintiff ordinarily may pursue in court only those claims he included in an EEOC charge or that are sufficiently alike or reasonably related to the allegations made in the EEOC charge.  *Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535, 550 (7th Cir. 2002); *Cheek v. Western & Southern Life Ins. Co.,* 31 F.3d 497, 501 (7th Cir. 1994).  The Seventh Circuit has examined this principle for retaliation claims and distinguished between claims of retaliatory conduct that occurred before the filing of the EEOC charge and those that occurred after, and because of, the filing of an initial EEOC charge.  Under Seventh Circuit precedent, claims that the employer

27

retaliated against the plaintiff after and because of her EEOC charge do not require a second

EEOC charge alleging retaliation. *McKenzie v. Illinois Dep't of Transportation,* 92 F.3d 473,

482-83 (7th Cir. 1996); *Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1312 (7th Cir. 1989) ("[W]e

join the other circuits that have spoken to the question in adopting the rule that a separate

administrative charge is not prerequisite to suit complaining about retaliation for filing the first

charge.")

  The Seventh Circuit has reasoned that a requirement to file a new EEOC charge for

retaliatory conduct alleged to have occurred because of the filing of the first charge would create

a needless procedural technicality and could deter employees from pursuing retaliation claims for

fear that a new charge would prompt still more retaliation. *McKenzie,* 92 F.3d at 482 (citing

*Gupta v. East Texas State Univ.,* 654 F.2d 411, 414 (5th Cir. 1981) (characterizing a second

EEOC charge in this context as a "needless procedural barrier" whose elimination will deter

employers from interfering with their employees' Title VII rights)). *See also Troutt v. City of

Lawrence,* 2008 WL 3287518 at *13 (S.D. Ind. 2008) ("To avoid unduly burdening the EEOC

(and to avoid an endless cycle of charge, lawsuit, retaliation, new charge, new lawsuit, etc.),

courts may permit employees who have filed a prior charge of discrimination and later allege

that they were retaliated against because of that charge to be excused from filing yet another

charge.").

  The City contends that *McKenzie* and like decisions from the Seventh Circuit and other

circuits permitting retaliation claims without a second EEOC charge do not survive the Supreme

Court's decision in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101 (2002).

Although *National Railroad* contains broad language supportive of the City's argument,

*National Railroad* addressed a statute of limitations issue much different from the exhaustion

issue at the heart of *McKenzie.*  It does not clearly overrule or undercut *McKenzie,* and this court is bound by *McKenzie* until the Seventh Circuit holds otherwise.

 *National Railroad* addressed the timeliness of an EEOC charge and whether an employee can pursue claims based on conduct that occurred before the filing of his EEOC charge but outside the statute of limitations.  Title VII's limitations period requires an EEOC charge to be filed within 180 days (or 300 days in "dual-filing" states, including Indiana) "after the alleged unlawful employment practice occurred" (42 U.S.C. § 2000e-5(e)(1)), and the Court addressed whether an employee can recover for acts of discrimination that occurred more than 180 (or 300) days before he filed his EEOC charge.  The Court stressed that the statute's limitations period is straightforward and unambiguous, and because a "discrete retaliatory or discriminatory act occur[s] on the day that it "happen[s]," then a party must "file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it."  536 U.S. at 110.  Except for hostile environment claims, the Court rejected a continuing-violation theory that would sweep in *old* acts of discrimination if they were alleged as part of "serial" conduct tied to acts for which a timely EEOC charge had been made.  *Id.* at 114.

 The issue addressed in *National Railroad* is materially different from the administrative exhaustion issue faced in *McKenzie*—whether a second EEOC charge is required to pursue a retaliation claim for conduct alleged to have occurred after and because of the filing of an initial EEOC charge.  The Supreme Court's decision does not purport to abridge the general rule that an employee may pursue claims sufficiently alike or reasonably related to the allegations made in the EEOC charge even if not specifically mentioned in the charge, the basis of the holding in *McKenzie*.  Nor does the decision undercut *McKenzie's* rationale that requiring a second charge

may tend to insulate employers from liability because their employees would decline to file charges with the EEOC for fear of more retaliation.

Although the Tenth Circuit views *National Railroad* as requiring an EEOC charge for every act on which a Title VII claim is based, including a charge of retaliation for having gone to the EEOC in the first place, *Martinez v. Potter,* 347 F.3d 1208, 1210-11 (10th Cir. 2003), other circuits have held, or signaled their agreement, that *National Railroad* does not abrogate the *McKenzie*-type "exception" to administrative exhaustion.  *Jones v. Calvert Group, Ltd.,* 551 F.3d 297, 303 (4th Cir. 2009) (deciding that *National Railroad* does not address extent to which EEOC charge "satisfies exhaustion requirements for claims of related, post-charge events," such as retaliation for filing the EEOC charge); *Wedow v. City of Kansas City, Missouri,* 442 F.3d 661, 673-74 (8th Cir. 2006) (permitting plaintiff to pursue retaliation claims for conduct about which EEOC charges were not filed where the EEOC charge at least alleged that the employer was engaging in some retaliatory conduct);  *Delisle v. Brimfield Twp. Police Dep't,* 94 Fed. Appx. 247, 252-54 (6th Cir. 2004) (unpublished decision) (finding that *National Railroad* does not abrogate rule that post-charge retaliation claims reasonably related to the filed charge do not need a new charge to be actionable).  *See also Weber v. Battista,* 494 F.3d 179, 183-84 (D.C. Cir. 2007) (noting disagreement between Tenth Circuit in *Martinez* and Eighth Circuit in *Wedow* but finding it unnecessary on the facts before it to choose a side).[19]

The Seventh Circuit has not directly addressed any tension between its *McKenzie* rule and the Supreme Court's analysis of the statute of limitations issue in *National Railroad,* but the

---

[19]	The City raised its argument that *McKenzie* was overruled by *National Railroad* for the first time in its reply brief.  It also cited the Tenth Circuit's decision in *Martinez* but failed to acknowledge the decisions that reject the argument, including this court's decision in *Troutt v City of Lawrence.*

court has favorably mentioned its *McKenzie* rule in a case post-dating *National Railroad,* thus demonstrating that the Seventh Circuit does not think *McKenzie* is overruled by *National Railroad.  See Horton v. Jackson County Bd. of County Comm'rs.,* 343 F.3d 897, 898-99 (7th Cir. 2003) (dictum cites *McKenzie* for rule that "retaliation for complaining to the EEOC need not be charged separately from the discrimination that gave rise to the complaint," but court's holding concerns whether employee may outside the class action context piggy-back a co-employee's EEOC charge to meet administrative exhaustion requirement).  In 2008, then District and now Circuit Judge Hamilton found *McKenzie* survived *National Railroad.  Troutt v. City of Lawrence,* 2008 WL 3287518 at *12 (S.D. Ind. Aug. 8, 2008) (the plaintiff's retaliation claim fits "a well-recognized exception" to the rule in *National Railroad* that each discriminatory act starts a new clock for filing EEOC charges).

Because the *McKenzie* rule and its rationale are not in conflict with *National Railroad,* the court DENIES the City's motion for summary judgment on plaintiff Finch's retaliation claims based on his failure to file EEOC charges for those retaliatory acts.[20]

---

[20]     The court acknowledges that at least some of Finch's retaliation claims may stretch to the breaking point *McKenzie's* underpinnings.  For example, the inference that the City retaliated against him for his EEOC discrimination charge based on failure to promote him in 2006—because three years later he didn't get a newer police car and the Chief did not treat him with respect (and after he received a promotion to captain and a second promotion to major)—is strained.  But because the City waited until its reply brief to argue that *National Railroad* abrogated *McKenzie,* the parties' briefing does not develop the more nuanced argument that based on *National Railroad,* a closer connection than Finch can show must be established between the EEOC charge and the subsequent retaliatory act in order for his failure to file a separate EEOC charge to be excused.  That argument is not foreclosed, but it is unresolved.

In its reply brief, the City points out that much of the alleged retaliatory conduct occurred years after plaintiff's Finch's EEOC charge, after he had received later promotions to captain and major, and concerns conduct Finch could not say was retaliatory but only bothersome.  (*See* City's reply brief, Dkt. 166 at p. 3).  The City's reply brief thus also suggests defenses to the merits of Finch's retaliation claims, but the City confined its argument on summary judgment to whether second and subsequent EEOC charges alleging the retaliatory conduct were

**III. On the equal protection claims, the plaintiffs are entitled to summary judgment against some defendants, some defendants are entitled to summary judgment, and questions of fact preclude summary judgment as to other defendants.**

The plaintiffs seek summary judgment on their claims, under 42 U.S.C. §1983, that all defendants violated the plaintiffs' rights to equal protection secured by the Fourteenth Amendment because the plaintiffs were denied promotions to the rank of captain because of their race. The individual defendants, in addition to defending the plaintiffs' motion, bring their own motion for summary judgment on the ground they are entitled to qualified immunity and, even if they are not, the plaintiffs as a matter of law are not entitled to punitive damages.

Section 1983 requires a plaintiff to show that he was "deprived of a right secured by the Constitution or federal law, by a person acting under color of law." *Padula v. Leimbach,* 656 F.3d 595, 600 (7th Cir. 2011). Here, the plaintiffs are required to show—through direct or indirect evidence—that each defendant intentionally discriminated against them based on race. *See Davis v. Wisconsin Dep't of Corrections,* 445 F.3d 971, 976 (7th Cir. 2006) (section 1983 equal protection claim requires proof of intentional racial discrimination).

There is no respondeat superior liability under section 1983. For an individual, one is responsible only for one's own actions and can be liable only on proof of his discriminatory animus. *Smith v. Bray,* 681 F.3d 888, 899 n.5 (7th Cir. 2012). The individual defendants, sued in their individual capacities, do not challenge that their roles in the promotional decisions as either the Chief of IPD (defendant Spears), members of the Merit Board (defendants Burks, Maxwell, and Smith), or members of the Transition Authority (defendants Peterson, Anderson, and Gray) were under color of law. All, except Chief Spears, contend there is no evidence they knew Chief

---

prerequisites to Finch's claims. The court has thus confined its analysis to the administrative exhaustion defense and does not reach the merits issues, which were not developed by the City and on which plaintiff Finch did not have an opportunity to respond.

Spears's promotion recommendations—which they followed—were race-conscious, and all argue that, if they did know, they are entitled to qualified immunity as a matter of law.

For the City, a municipal corporation can be liable as a person under section 1983 where "action pursuant to official municipal policy" caused the rights violation and injury. *Monell v. Department of Social Servs.,* 436 U.S. 658, 691-92 (1978); *Palka v. City of Chicago,* 662 F.3d 428, 434 (7th Cir. 2011). The City does not challenge that the promotion decisions at issue satisfy the *Monell* standard.

To evaluate the parties' motions on the equal protection claims, additional facts must be addressed.

### A. Additional facts are pertinent to analysis of the equal protection claims and defenses.

In this section, the court discusses those additional facts material to the plaintiffs' section 1983 equal protection claims that are undisputed in the record, and identifies those about which there are disputes requiring a jury's resolution. These facts trace the decision-making process from Chief Spears to the Merit Board to the Transition Authority effecting the December 2006 promotions to captain.

#### Chief Spears's Understanding of the Consent Decree

Chief Michael T. Spears, a white male, was appointed to the position of Chief of IPD in 2005 and served as Chief for five years. (Spears Dep., Dkt. 161-8, p. 31, line 21; p. 7, lines 14-18). He previously served as an Assistant Chief, beginning in 1998. (*Id.,* p. 6, lines 2-5). Chief Spears has never read the Consent Decree (*Id.,* p. 29, line 21 to p. 30, line 2), but he was aware through personal observation while an Assistant Chief that men who had served as Chief before him "routinely used the Consent Decree to help ensure diversity in their promotional recommendations"; in Chief Spears's view, "it was a regular occurrence in the promotional

processes."  (*Id.,* p. 25, lines 3-24; p. 27, lines 7-10).  Throughout his time with the police

department (which he joined as a patrol officer in January 1982, *id.,* p. 5, lines 6-7), Chief Spears

understood—and believes his understanding was shared by management and "really the

organization" as a whole—that the Consent Decree recommended that there be 25 percent

representation [of African Americans] in promotions and in hiring."  (*Id.,* p. 28, lines 3-8).  Chief

Spears believed that for promotions, if there were enough African American candidates in rank

order to fill promotions, then deviations from rank order were not necessary or "you wouldn't

have to . . . deviate as much" from rank order, but "if there wasn't 25 percent African American

representation in rank order then [the Chief] would try to find other candidates to get close to

that number."  (*Id.,* p. 29, lines 1-12).  Chief Spears had heard from others (various chiefs, public

safety directors, attorneys) for many years, and understood, that 25% was the goal under the

Consent Decree for the number of promotions that should be made to African Americans.  (*Id.,*

p. 49, lines 15 to p. 50, line 2).[21]

---

[21]    The defendants have designated other undisputed evidence of a widely-held belief within
the police department that the 1978 Consent Decree either permitted or required the City to make
promotions of African American officers out of order on promotion eligibility lists and based on
their race in support of an overall goal of racial diversity within the police department.  In
addition to the *Black* decisions reflecting race-based promotions in 1993, these views are well-
represented in a group of documents related to complaints and grievance processes spanning
2002-2006 concerning a white officer (Officer Wheeler) who complained that he had been
denied promotions more than once based on his race.  (*See* Dkt. 149-14, containing numerous
documents tracking Officer Wheeler's grievances from an initial complaint to an EEO officer, up
through IPD's human resources division and including the Chief of Police, and ultimately to the
Merit Board).

        The Merit Board publicly heard one of Officer Wheeler's grievances at a meeting on
October 21, 2004.  At the meeting, a lawyer for the City advised the Board that the Consent
Decree permitted race-based promotion decisions:  "Ms. Gritton also addressed the Consent
Decree guidelines. The Decree set percentages for racial and ethnic composition of the work
force as it relates to *hiring* practice and that promotions were to be reasonably representative."
(*Id.* at p. 58).  Chief Barker, who was then chief of IPD, told the Board his view that the
department should reflect the diversity of the community, and "he will endeavor to continue to

The first promotion recommendations Chief Spears made in his role as chief occurred in 2005 when he was appointed Chief.  Those recommendations, which involved seven or eight promotions to the merit rank of sergeant and one to the merit rank of lieutenant, were all in rank order of the applicable promotion eligibility list.  (*Id.,* p. 31, lines 14-23).  For these recommendations, Chief Spears was not worried "as much" about whether there was a ratio of 25% African American officers in his recommendations; there weren't that many promotions involved, and he was just filling in vacancies as they came up.  (*Id.,* p. 33, line 24 to p. 34, line 8; p. 57, lines 20-25).

The 2006 promotions presented a unique time in the police department's history because of the issues surrounding the merger of IPD and the Sheriff's Department.   For the combined departments, there appeared to be an excess of sergeants and lieutenants, and in the Sheriff's Department, the rank of captain was appointed rather than a permanent merit rank as it was within IPD.  (*Id.*, p. 31, line 25 to p. 32, line 18).  A decision was made that within IMPD—the new combined police force—captain would be a permanent merit rank, which meant that the Sheriff's Department's appointed captains would return to their prior merit rank in the new

---

do that."  (*Id.* at p. 60).  Merit Board member Michael Morken expressed his view that promotions should always follow only rank order and "I cannot vote out of rank order."  (*Id.*). In his deposition, Mr. Morken, who had been a member of the Merit Board since 1988, recalled discussions about the Consent Decree over the years in Merit Board meetings, and expressed his view that the Consent Decree did in fact "recommend" race-based promotions as a "goal," but that race-based promotions were not required.  (Dkt. 165-3 at p. 50, line 11 to p. 52, line 13).

The Wheeler grievance materials reflect confusion about what exactly the Consent Decree required or permitted and whether the City had reached its diversity goals or could or should continue to allow race to influence promotion decisions.  Indeed, the board passed a motion at the October 21, 2004 meeting that within 60 days, "City Legal and the department's staff to provide the Board their analysis of the requirements of the consent decree, where we were when it was entered (i.e. 2% 3% . . .) and where we are today so that the board can assess as to whether we have made progress or even as [Officer Wheeler] suggests if we are even complying with the terms."  (Dkt. 149-14 at p. 61).  No evidence was designated that the requested legal analysis was ever done or provided to the Board.

IMPD.  (*Id.*). Vacancies were expected within IPD's captain ranks as well (*Id.,* p. 33, lines 1-7).

Based on these and other personnel considerations, Chief Spears determined that eleven

promotions to the merit rank of captain should be made.  Chief Spears was not certain how the

Consent Decree would apply to these promotions with the merged department under IMPD.  (*Id.*,

p. 33, lines 6-17).

**Chief Spears outlines his promotion recommendations and seeks input from City Legal**

On Monday, December 11, 2006, Chief Spears sent an email (Dkt. 149-21) to Suzannah

Overholt (an attorney involved with the transition to IMPD, Dkt. 161-8, p. 50, lines 3-18) and

Kevin Murray (a legal advisor to Sheriff Anderson, Dkt. 161-8, p. 53, lines 13-22) with a copy to

Jerry McCory (an employee in Mayor Peterson's office, Dkt. 161-8, p. 83, lines 4-11) to advise

them of the eleven promotion recommendations to captain that he intended to make at a meeting

of the Merit Board scheduled for Thursday, December 14, 2006, and a meeting of the Transition

Authority scheduled for December 19, 2006.  Before the email, Chief Spears had not received

any advice about what the Consent Decree required for the 2006 promotions.  (*Id.,* p. 88, lines

2-11).  The email outlined each of his recommendations and the reasons for them, including that

three of the recommendations were out-of-order "consent decree" promotions and two were out-

of-order to achieve proportional representation within the eleven promotions of former sheriff's

deputies.  Chief Spears's email said he wanted "to make certain I am working within all

applicable law and the consent decree."  (Dkt. 149-21)  Chief Spears asked the recipients "to

review the proposed promotions below to be certain I am making recommendations which are

compliant with law" and policy and to advise him of any problems or concerns.  (*Id.*).  The email

calculated that because three of the eleven candidates for promotion are African American

individuals and three of the eleven are Sheriff's Department officers, his recommendations achieve a percentage of 27.27% for these two categories.   (*Id.*).

By Wednesday night—the night before the Merit Board meeting—Chief Spears had not received a response, and at 9:06 p.m., he forwarded the email to Suzannah Overholt and Kevin Murray, and to Kobi Wright, the head of the City's legal department (the Office of Corporation Counsel) and asked for a response about the appropriateness of his promotion recommendations. (*Id.*).  Chief Spears received a response, by email, on Thursday, December 14, 2006, at 8:59 a.m., from Suzannah Overholt, who said—in total:  "Sorry – I thought Kobi got back to you.  He said everything looks fine.  Therefore you can go ahead with them."  (Dkt. 149-21).  He also received a response, by email at 8:14 a.m. on December 14, from Kevin Murray, who said—in total:  "I asked Kobi Wright last night and he reported that the promotions were in accord with the Consent Decree.  I concur with his opinion.  Someone from [the Office of Corporation Counsel] should be present to confirm that and be able to answer questions."  (Dkt. 149-22).

Chief Spears received no other written responses to his email or any other inquiry he may have made regarding the appropriateness of his planned recommendations.  He recalls having an in-person conversation with Mr. Wright after he received Suzannah Overholt's response and apparently in advance of making his recommendations to the Merit Board in which Mr. Wright said that "it was fine to [make the recommendations], that's what we need to do, that's what the Consent Decree required."  (Spears Dep., Dkt. 161-8, p. 90, lines 10-15).  The foregoing conversation with Mr. Wright and the responses to the email from Ms. Overholt and Mr. Murray reporting Kobi Wright's opinion that everything was "fine" or in accord with the Consent Decree are the extent of the legal advice Chief Spears received regarding the appropriateness of his

recommendations, including his reliance on the Consent Decree to make promotions out-of-order based on race.[22]

The defendants did not designate any other evidence regarding the opinions Mr. Wright is purported to have given to Chief Spears regarding the Consent Decree nor regarding any analysis Mr. Wright engaged in to reach the opinions attributed to him.

**Chief Spears makes his recommendations to the Merit Board**

Chief Spears prepared a document (Dkt. 161-10) to use as an outline for his promotion recommendations to the Merit Board on the evening of December 14, 2006, and the Transition Authority on December 19, 2006.  (Spears Dep., Dkt. 161-8, p. 67, line 24 to p. 68, line 17; p. 93, line 24 to p. 94, line 8).[23]  The outline describes Chief Spears's recommendation that eleven promotions to captain should be made (for filling existing and expected vacancies) and names the candidates he recommends and the reasons for recommending them—either because of strict rank order of the eligibility list or out-of-rank order "pursuant to the consent decree" or out-of-rank order to achieve proportionality between IPD and Sheriff's Department candidates.

---

[22]      The City submitted an affidavit of Ms. Overholt stating that she made "a detailed legal review" of Chief Spears's planned recommendations, including a review of the *Black* decisions addressed earlier in this entry, and that she gave legal advice to Chief Spears.  *See* Dkt. 165-1, ¶ 8.  But her affidavit at paragraph 9 confirms that *her only communication of advice to Chief Spears was the email communication, at Exhibit U (Dkt. 149-21), in which Ms. Overholt reported that "Kobi [Wright] . . . said everything looks fine.*  Therefore you can go ahead with [the promotion recommendations]."  Thus, whether or not Ms. Overholt engaged in any legal analysis, the evidence remains undisputed that her only "advice" was passing along Mr. Wright's opinion that "everything looks fine."

[23]      The City's statement that Chief Spears used this document only in his presentation to the Transition Authority (Dkt. 166 at pp. 9-10) and not to the Merit Board is contrary to the evidence.  Chief Spears testified that he used this document in his presentation to the Merit Board, although he did not believe he gave the document to Merit Board members.  (Spears Dep. at p. 93, line 24 to p. 94, line 8; p. 103, line 21 to p. 104, line 10; p. 110, lines 1-9).  Further, Chief Spears's presentation to the Transition Authority was videotaped and he did not follow this outline in that presentation.

At least three African American candidates were recommended out-of-rank order because Chief Spears was following the "25% rule" he believed was needed under the Consent Decree even though his preference would have been to go in order on the eligibility list.  (*Id.*, p. 75, lines 4-23).

Chief Spears believes he used his outline to make his presentation to the Merit Board but that the members of the Merit Board were not given a copy of it.  (*Id.,* p. 93, line 24 to p. 94, line 8). Merit Board members were given a document that ranked all 52 of the promotion candidates, and listed their scores, race, and whether they were IPD or Sheriff's Department officers.  (Smith Dep., Dkt. 161-30, p. 46, line 21 to p. 47, line 16, and Smith Dep. Ex. 5 (Dkt. 161-32); Burks Dep., Dkt. 161-24, p. 44, line 16 to p. 45, line 3; Morken Dep., Dkt. 161-21, p. 33, lines 3-22, p. 34, line 19 to p. 35, line 8, p. 42, lines 12-17, and Morken Dep. Ex. 1 (Dkt. 161-1); Spears Dep., Dkt. 161-8, p. 81, lines 4-12).  Merit Board members were also given a packet of information regarding each of the eleven candidates Chief Spears recommended, including the candidate's picture, personnel history, and a recitation of significant events in the candidate's career as an officer.  (*See* Morken Dep., Dkt. 161-21, p. 33, line 23 to p. 34, line 11; Spears Dep., Dkt. 161-8, p. 80, lines 10-16).

In his deposition, Chief Spears did not recall specifically whether he described any of his out-of-order recommendations as "consent decree" promotions, or whether the Consent Decree was discussed during the Merit Board meeting.  (*Id.,* p. 102, line 14 to p. 104, line 1).  The minutes of the meeting do not describe Chief Spears's presentation or any discussions that led to the 3-2 vote by the Merit Board to follow Chief Spears's recommendations; it appears that any detailed discussion by Chief Spears was presented to the board in its private, executive session, which the minutes do not describe.  (Dkt. 161-23).  The minutes appear to reflect only the public

portion of the meeting and state only that Chief Spears referred the board members to an

organizational chart and then tendered recommendations of specific persons whose names are

listed in the minutes.  (*Id.*)   Board member Michael Morken, who has served on the board since

1988 (and who, along with board member Debbie Barnett, dissented from the out-of-order

candidates because he and Ms. Barnett always vote to approve only rank order promotions, *id.*)

testified that Chief Spears did explain that the Consent Decree was his rationale for

recommending the out-of-rank order promotions of three African American candidates, a

rationale Mr. Morken remembers typically was given in prior years when the chief of IPD

recommended the promotions of African American officers out-or-rank order on an applicable

eligibility list.  (Morken Dep., Dkt. 161-21, p. 41, line 24 to p. 42, line 11).  None of the other

board members recalled in their depositions—taken in July 2011—that Chief Spears had

explained his out-of-rank order recommendations as based on the Consent Decree.[24]

---

[24]     Mr. Smith, who was new to the Merit Board as of 2005 or 2006, did not recall being told
that any of Chief Spears's recommendations were based on, or influenced by, the terms of the
Consent Decree, or that the Consent Decree affected police department promotions.  (Dkt. 161-
30, p. 49, lines 2-13, p. 50, lines 19-25, p. 51, line 22 to p. 52, line 21).   Ms. Maxwell, who was
a member of the Board from 2000 to the end of 2006, was aware generally that the Consent
Decree was sometimes a consideration in promotion decisions but did not recall in her deposition
anything about Chief Spears's presentation at the December 2006 meeting.  Her "one and only
barometer" for promotion decisions was the Chief's recommendations because she trusted the
Chief's judgment on the qualities of candidates he recommended.  Although Ms. Maxwell would
not vote to promote a candidate "solely" on the basis of his race, she would follow a
recommendation of an African American candidate who was at the bottom of a promotion
eligibility list because she trusted the Chief's recommendations.  (Maxwell Dep., Dkt. 161-28, p.
38, lines 10-17, p. 53, line 24 to p. 54, line 20; p. 54, line 21 to p. 55, line 20).  Ms. Burks, who
became a member of the Merit Board in 2001 or 2002, testified that she followed the
recommendation of the Chief in voting on the 2006 promotions.  She did not recall in her
deposition any comments Chief Spears made about his out-of-rank recommendations or having a
feeling that the recommendations were based on race rather than a number of factors.  "Race
may have been involved," but she could not recall Chief Spears discussing race.  (Burks Dep.,
Dkt. 161-24, p. 49, line 23 to p. 52, line 4).

**Chief Spears makes his recommendations to the Transition Authority**

Chief Spears made his presentation to the Transition Authority on December 19, 2006, the members of which were Mayor Peterson, Sheriff Anderson, and City-County Council President Gray. The presentation was made in a public meeting, which was recorded on video. The transcript of the meeting confirms testimony that Chief Spears did not discuss the rankings on the eligibility list of the individual candidates he recommended for promotion or how those rankings compared to anyone else, and no one ever mentioned the Consent Decree. (*See* Dkt. 161-16, transcript of meeting; Spears Dep., 161-8, p. 132, lines 13-25). Chief Spears's presentation of the officers recommended for promotion, and the Transition Authority members' ratification of his recommendations, had a ceremonial flavor. Chief Spears explained that the promotions had been approved by the Merit Board. Nearly all of the eleven officers the Merit Board approved as captains for the new IMPD were present at the meeting, and Chief Spears remarked how he was proud of all eleven and proud to recommend them to the Transition Authority. (Dkt. 161-16).

The record includes some additional evidence regarding the knowledge of the Transition Authority members. Defendant Bart Peterson testified (a) he was not aware of any evidence of race discrimination in the 2006 promotion process (Peterson Dep., Dkt. 161-13, p. 73, line 25 to p. 74, line 8); (b) never saw Chief Spears's December 11, 2006 email (Dkt. 149-21) to Suzannah Overholt, Kevin Murray, and Jerry McCory that outlined the Chief's recommendations (Peterson Dep., p. 86, line 15-17); and (c) did not have any discussions with Ms. Overholt, Mr. Murray, Mr. McCory, Sheriff Anderson, or City-Council President Gray about the 2006 promotion process or any of the candidates before voting on the promotions at the Transition Authority meeting. (*Id,* pp. 89-90). Defendant Monroe Gray testified the only information he received

41

regarding the promotions occurred at the Transition Authority meeting itself.  (Gray Dep., Dkt. 149-30, p. 57, lines 11-17, p. 58, line 24 to p. 60, line 8, p. 62, lines 1-6).  Chief Spears testified that at some point before the Merit Board and Transition Authority meetings, he met with Sheriff Anderson and discussed his recommendations and the reasons for them.   He believes he and Sheriff Anderson discussed "the Consent Decree thing" and that the new IMPD was "bound to follow it."  (Spears Dep., p. 121, line 22 to p. 122, line 12).  Sheriff Anderson did not recall having any discussions with Chief Spears regarding the promotions or the Consent Decree. (Anderson Dep., Dkt. 161-37, p. 46, lines 9-13, p. 47, lines 7-16).

### B.  Questions of fact preclude summary judgment on the liability of the individual defendant Merit Board Members.

Merit Board member Michael Morken testified that Chief Spears noted race or the Consent Decree as the basis for his out-of-order recommendations.  The testimony of the individual defendant members differs.  The evidence thus presents a factual issue for the jury's resolution whether the Merit Board member defendants knew, in following Chief Spears's recommendations, that his recommendations of three African American candidates were out-of-rank order and the decisive reason for recommending them instead of higher-ranked candidates was their race.  A jury reasonably could infer that the board's attention was drawn to the fact that some of the recommendations were out-of-rank order since two of their members voted in favor of only the candidates ranked 1-7 because those were in rank order and dissented from approving the promotions of the out-of-order candidates (Dkt. 161-23), and it is reasonable to infer that Chief Spears told the board members his reason—the Consent Decree—for going out of order.[25]

---

[25]     The Consent Decree requires that the chief can articulate a reason for passing over for promotion an officer ranked higher on an eligibility list than another who is promoted—an officer who is passed over is entitled, on written request, to know exactly why he was passed over.  *See* Consent Decree, Section IX.C.6.

A jury reasonably could decide based on Chief Spears's presentation notes, his belief that he followed those notes in making his presentation to the Merit Board, and Mr. Morken's testimony, that Chief Spears in fact explained that the out-of-order recommendations of the officers ranked 12th, 17th, and 26th were based on the Consent Decree—meaning because they are African American—even if the Merit Board defendants did not remember the bases for Chief Spears's recommendations when asked five years later in their depositions. Therefore, unless defendants Burks, Maxwell, and Smith are shielded by qualified immunity, a jury must determine whether they violated the equal protection rights of the plaintiffs. [26]

### C. Transition Authority members Mayor Peterson and Monroe Gray are entitled to summary judgment on the plaintiffs' section 1983 claims; questions of fact preclude summary judgment on the liability of Sheriff Anderson.

The facts discussed above reveal no direct evidence that, other than Sheriff Anderson, the members of the Transition Authority knew the bases for Chief Spears's promotion recommendations. The plaintiffs argue first, however, that it is reasonable to infer that Mayor Peterson, and likely Sheriff Anderson and City-Council President Monroe Gray, had a copy of the eligibility list itself that ranked in order all 52 promotion candidates with their names, race, and affiliation with either IPD or the Sheriff's Department. But even if that is a reasonable inference[27] and even if it is then also reasonable to infer that the members of the Authority

---

[26]    Whether qualified immunity alters this result is addressed in section III. E *infra*.

[27]    The Transition Authority voted to ratify the "promotional lists" that were certified by the Merit Board (*see* Dkt. 161-16 at p. 4). Although the evidence is far from clear, apparently a list certified by the Merit Board was the document ranking the 52 captain candidates in order, and listing each person's race and affiliation with either IPD or the Sheriff's Department. The court indulges the plaintiffs' argument that a jury could decide this list was given to Transition Authority members, even though the contention is speculative and there is evidence to the contrary. (*See* Peterson Dep., Dkt. 149-24, p. 75, line 12 to p. 77, line 13, Gray Dep., Dkt. 149-30, p. 54, line 11 to p. 56, line 11, p. 60, line 13 to p. 61, line 13).

actually noticed the ranking of each candidate and his race, the list itself gives no hint why candidates were recommended for promotion over those ranked higher on the eligibility list. The plaintiffs ask the court to conclude that because the list revealed that African American officers were recommended over higher-ranked Caucasians, then the Transition Authority members knew recommendations were based on race. It is not reasonable to conclude that African Americans achieve promotion over others only because of their race. In fact, a white officer also was recommended out of rank order by Chief Spears.[28]

Relatedly, the plaintiffs argue that Chief Spears's comments about the number of captains who are African Americans are evidence the Transition Authority members knew his promotion recommendations of the African American officers were *because* of their race. Again, an officer's race, even when tied to his ranking, does not mean his race was the reason for his promotion. Chief Spears highlighted that IPD had "made great strides in making certain that we have a group of captains which represent the diversity of our city," noted that no African American male had been promoted to captain since 1988, that since June 1972, only six African American males had been promoted to captain, and "today, we are effectively promoting fifty percent of the number of candidates that we have in the last thirty-four years." (Dkt. 161-16). These comments do not, however, create an inference that these defendants knew race was the trump card in the promotion of three of the candidates. Racial diversity within a police force is,

---

[28]     The plaintiffs' statement (Dkt. 160 at p. 24) that Chief Spears did not advise the Transition Authority of any "non-race based reason for the out-of-order promotions" of the African American officers is a misleading characterization of the evidence because, in fact, Chief Spears did not describe *any* reasons any particular officer received his recommendation or the approval of the Merit Board. The plaintiffs also paint a misleading picture with their observation (*id.*) that Chief Spears introduced to the Transition Authority the three African American officers and asked them to stand when, in fact, Chief Spears introduced to the Transition Authority *all* of the eleven candidates approved by the Merit Board, nine of whom were present at the Transition Authority meeting and were asked to stand and be recognized by the Authority. (Dkt. 161-16 at p. 3).

in fact, a legitimate and compelling interest of municipal government (and a Consent Decree goal for IPD).  *See Alexander v. City of Milwaukee,* 474 F.3d 437, 445 (7th Cir. 2007) (citing *Petit v. City of Chicago,* 352 F.3d 1111,1114 (7th Cir. 2003), and *Wittmer v. Peters,* 87 F.3d 916, 919 (7th Cir. 1996)).

The plaintiffs are left to argue that Transition Authority members learned through information given them *outside* the Transition Authority meeting that three of Chief Spears's eleven promotion recommendations were "Consent Decree promotions" based on the race of those officers.  The evidence designated by the plaintiffs, described above, would permit a jury to decide that Sheriff Anderson knew that for the African American candidates recommended by Chief Spears, their race was the reason Chief Spears recommended them over Caucasian officers who ranked higher on the eligibility list.  But no such evidence has been designated as to defendants Peterson or Gray.

As to defendant Peterson, the plaintiffs presented no evidence contrary to his testimony and, in particular, no testimony from Ms. Overholt, Mr. Murray, Mr. McCory, Sheriff Anderson, or Mr. Gray (or Chief Spears or anyone else) that any discussed the promotion process or any candidates or the Consent Decree or race considerations with Mayor Peterson before the Transition Authority meeting.  The plaintiffs assert that because Jerry McCory worked in the Mayor's office, was a liaison for Mayor Peterson on public safety matters and the Mayor's Transition Authority responsibilities, and conveyed to Mayor Peterson information within the scope of his duties, and because Chief Spears included Jerry McCory as a recipient of the email because he was in the Mayor's office (*see* plaintiffs' brief, Dkt. 160 at p. 8), a jury could decide that the Mayor did review Chief Spears's email or otherwise discuss its contents with Mr. McCory.  A reasonable jury would not be permitted to draw that inference, however, at least

without evidence that Mr. McCory in fact gave the email to the Mayor or that he or someone else discussed the contents of the email and the meaning of Chief Spears's references to "consent decree" promotions.  The plaintiffs have designated no such evidence.   There is no evidence—but only sheer speculation—upon which a jury could decide that Mayor Peterson's testimony is not true or otherwise infer that he knew race was a determining factor for Chief Spears in recommending three African American candidates for promotion.  That is insufficient to survive summary judgment.  *Michael v. St. Joseph County*, 259 F.3d 842, 845 (7th Cir. 2001) (definite and concrete evidence is required to rebut summary judgment motion; merely raising "metaphysical doubt" is not enough).  Defendant Peterson is therefore entitled to summary judgment on the plaintiffs' claim he intentionally discriminated against them based on race.

The plaintiffs also do not identify any evidence that Mr. Gray obtained information outside the December 19, 2006 Transition Authority meeting related to the 2006 promotions.  Thus, there is no evidence upon which a jury could decide that defendant Gray knew that race was the basis for Chief Spears's recommendations of three African American candidates for captain over Caucasian officers ranked higher than them on the eligibility list.   Defendant Gray is therefore also entitled to summary judgment on the plaintiffs' claim he intentionally discriminated against them based on race.

As noted above, the facts are in dispute as to whether Sheriff Anderson was aware of the Consent Decree and affirmative action rationale for Chief Spears's recommendations.  A jury must resolve these disputed facts, unless Sheriff Anderson is entitled to qualified immunity.[29]

---

[29]     Qualified Immunity is addressed in section III. E *infra.*

### D. The plaintiffs are entitled to summary judgment against the City and against Chief Spears on their equal protection claims under section 1983.

The City and Chief Spears admit that his promotion recommendations, which were approved and implemented, were race-conscious. "'Race-conscious employment decisions made by the state are presumptively unconstitutional and will satisfy the requirements of equal protection only where they are consistent with strict scrutiny.'" *Finch v. Peterson,* 622 F.3d 725, 728 (7th Cir. 2010) (quoting *Alexander v. City of Milwaukee,* 474 F.3d 437, 444 (7th Cir. 2007)). The City and Chief Spears have the burden to prove the use of race as a basis for the promotion decisions satisfies strict scrutiny. *Alexander*, 474 F.3d at 445 (citing *Johnson v. California,* 543 U.S. 499, 505 (2005)). "To satisfy strict scrutiny, classification schemes involving race must serve a compelling state interest and be narrowly tailored to further that interest." *Alexander,* 474 F.3d at 444 (citing *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 235 (1995)).

Seventh Circuit precedent establishes that racial diversity in law enforcement is a compelling government interest, particularly for a police force that serves and protects a racially and ethnically diverse large city. *Id.* at 445 (citing *Petit v. City of Chicago,* 352 F.3d 1111, 1114 (7th Cir. 2003) and *Wittmer v. Peters,* 87 F.3d 916, 919 (7th Cir. 1996)). But government cannot depart from racial neutrality to serve that interest unless the means used are narrowly tailored to satisfy specific and identifiable needs that are compelling under the circumstances.

> A race-conscious promotion system with no identifiable standards to narrowly tailor it to the specific, identifiable, compelling needs of the municipal department in question cannot pass constitutional muster.

*Id.* at 446.

Here, the City has not presented any evidence that would permit a reasonable jury to conclude that the City's actions satisfy strict scrutiny. As was its defense to the plaintiffs' claims for race discrimination under Title VII, the City's defense to the plaintiffs' equal protection

claims is that Chief Spears's promotion recommendations were in "compl[iance] with the

Consent Decree."  (Dkt. 166 at p. 32).  As a matter of law, the Consent Decree did not require or

permit the City to promote African Americans to the merit rank of captain based on their race.

And for the reasons discussed in connection with the plaintiffs' Title VII claims, the City

was obligated by the Consent Decree to base promotion decisions to the merit ranks of sergeant,

lieutenant, and captain "upon relevant standards and criteria . . . applied *without regard to race*

*or color."*  (Consent Decree, Section IX.C.1; emphasis added).  *See also* Section VIII.A:  The

City "will not limit, segregate or classify their employees in a way which would deprive any

individual of employment opportunities, or otherwise adversely affect his or her status as an

employee with respect to *promotions,* job assignments or responsibilities or any other terms,

conditions, privileges of employment *because of such individual's race or color."* (emphasis

added).

The Consent Decree provided the narrowly tailored means by which the City could serve

a compelling interest of racial diversity within its merit ranks.  Those means started with

recruiting African Americans to apply for admission to training classes to become patrol officers;

then, constituting all future training classes with a sufficient number of African Americans

(otherwise meeting the qualifications for admission) that they make up at least 25% of the

training class[30]; employing testing and interviews validated as race-neutral for making

appointments to patrol officers and for promotions to merit ranks; and ensuring the wide-

availability of training, work assignments, and educational opportunities for acquiring skills

helpful or necessary to advancement. (*See* Consent Decree at I.C.; IV.A.2; IV.C.1-4; V.A.; VI.;

---

[30]     This 25% quota for training classes was to last until the number of African Americans
within IPD as a whole "more nearly reflect[ed]" the racial composition of Marion County.
Section IV.A.1.

IX.C.3-4).  Under the design of the Consent Decree, therefore, racial diversity in the merit ranks would develop naturally over time with increasingly larger numbers of African Americans entering the pool as first-level patrol officers and then competing on a race-neutral basis to obtain promotions up through the ranks.  The City of Indianapolis was bound by a court order—the Consent Decree—to *exclude* race as a criteria or factor for promotion decisions.  The promotions here were not "compliant" in any way with the Consent Decree and the City's attempt to use the Consent Decree to justify its race-conscious promotions decisions fails strict scrutiny.

Moreover, even if the City had not been bound by a Consent Decree that prohibited it from considering race as a factor in promotions, its actions as a matter of law do not satisfy strict scrutiny.  Only a "carefully designed curative measure" for past discrimination can satisfy strict scrutiny:

> The equal protection clause forbids states to give preference to persons on the basis of their race. . . , even if theirs is not the white race.  The Supreme Court has, however, carved an exception for the case in which discrimination against whites is necessary to rectify previous discrimination in their favor committed by the state agency that is seeking to practice remedial discrimination. . . . [W]e must consider whether the [state agency] ever discriminated unlawfully in favor of whites [but] also whether, if so, the curative measures taken . . . have been carefully designed to avoid unnecessary injury to white persons.

*Billish v. City of Chicago,* 989 F.2d 890, 893 (7th Cir. 1993).

The City made no evaluation whether racial discrimination was a necessary remedial measure in 2006 to rectify past discrimination by the City against African Americans in the police department.  Presumably, since 1978, the City has been attuned to prohibiting race discrimination against African Americans (intentional or not), monitoring as race-neutral entrance and promotion tests, interviews, and evaluations, and putting in place other practices to assure that officers, no matter their race, had equal opportunities.  The City offered no evidence

49

that nearly 30 years later in 2006, the police department was still infected by the vestiges of past practices that led to the Consent Decree in the first place.

Here, Chief Spears used a racial quota—25% of the 11 promotions to be made—with no tie to any perceived past discrimination, no analysis of the present effects of any past discrimination, no evaluation of its necessity as a remedial measure, and no careful consideration of its impact on white candidates passed over for promotion.

In its brief opposing summary judgment, the City cites statistics regarding the percentage of African Americans within various IPD merit ranks as of the December 2006 promotions to show that the City still had a long way to go to meet a purported Consent Decree goal that within all of its ranks, from patrol officer to captain, African Americans should occupy the same percentage that African Americans populate the Marion County labor force. They say this percentage is 25%, and thus the racially discriminatory promotions are justified. (*See* City's briefs, Dkt. 150 at pp. 19-20, and Dkt. 166 at pp. 5-7).[31] This argument not only ignores the Consent Decree's prohibition of race-based promotions, there is no other firm grounding for it in the Consent Decree, which establishes a goal (though to be achieved race-neutrally) of

---

[31]     This 25% is very different from Chief Spears's 25%. Chief Spears's understanding of the Consent Decree was that, when promoting a group of officers, 25% of those promotions should go to African Americans, and out-of-rank order promotions should be made to the extent necessary to get close to this percentage. That calculation does not consider Marion County's labor force or even the percentage of African Americans that already occupy any particular rank, and it is a different characterization of the Consent Decree's requirements than other City officials over the years suggested the Consent Decree permits or requires. For example, in 2004, according to the minutes of a Merit Board meeting, a city attorney told the Board that "by the consent decree the courts have authorized [IPD] to do what it can to provide diversity in all levels of the work force including making promotions," and that the "design of the decree was to permit percentages at the hiring level to follow this same percentage up through the system." (Dkt. 149-14 at p. 57). A different lawyer for the City, in the same meeting, advised that for promotion decisions, it was not proper to measure against the general labor force: "Ellen Gabovitch advised that the *General* labor force is not the comparison – that figure is for hiring only. She stated there is a difference between hiring and promoting". (*Id.,* at p. 59) (emphasis in original).

promoting African Americans to a merit rank representative of their percentage in the rank from which the promotion is made—not the percentage of African Americans in Marion County's labor force.  In fact, the *Black* court rejected this argument as a defense to Title VII liability; it certainly cannot trump the more demanding strict scrutiny standard required under the equal protection clause.  (*See* Dkt. 149-6 at p. 8).

At best, the City has substantial and undisputed evidence of a long-standing and honestly held conviction the Consent Decree allowed IPD, in some fashion, to discriminate in favor of African Americans in promotion decisions based on their race to achieve some measure of racial diversity.  Aside from the fact the City, and its officials, cannot precisely or consistently articulate a promotional standard they believed the Consent Decree permitted (or required), as a matter of law the Consent Decree prohibited race-conscious promotion decisions.  The plaintiffs are therefore entitled to judgment that the City violated their rights to equal protection under the Fourteenth Amendment.  And unless Chief Spears is entitled to qualified immunity (discussed below), the plaintiffs are entitled to summary judgment on their equal protection claims against him.

### E.  Chief Spears, the Merit Board defendants, and Sheriff Anderson are not entitled to qualified immunity.

The court now turns to the defendants' qualified immunity defense. As addressed in the preceding section regarding the City's liability under section 1983, Chief Spears's admitted race-based promotion decisions do not satisfy strict scrutiny; as such, the plaintiffs are entitled to judgment against him in his individual capacity unless qualified immunity shields him from liability. For defendants Smith, Maxwell, Burks, and Anderson—as discussed above—a jury must determine whether they knowingly discriminated against the plaintiffs unless they too are shielded from individual liability by qualified immunity. For defendants Peterson and Gray—as

51

discussed above—a jury could not on the record before the court find they knowingly discriminated against the plaintiffs; qualified immunity issues are therefore not relevant to them.

The individual defendants assert two grounds for qualified immunity. First, they repeat the argument that the Consent Decree required race-based promotion decisions and they may not be found liable for making decisions dictated by the Consent Decree. Second, they assert that Chief Spears's receipt of legal advice that his promotion recommendations were "fine" or in accord with the Consent Decree is an "extraordinary circumstance" protecting them from liability despite the fact that, at the time of the 2006 promotion decisions, the law was clearly established that race-based employment decisions that do not withstand strict scrutiny violate the equal protection clause.

      1.   <u>Qualified immunity is an issue of law for the court.</u>

"Qualified immunity protects [a government official] from liability if a reasonable [official] could have believed that the action taken was lawful, in light of clearly established law and the information the [official] possessed at the time." *Phillips v. Community Ins. Corp.,* 678 F.3d 513, 527-28 (7th Cir. 2012). Thus, the court examines two questions: (1) whether a constitutionally protected right has been violated and (2) if so, whether the right was clearly established at the time of the violation. *Alexander v. City of Milwaukee,* 474 F.3d 437, 444 (7th Cir. 2007).

As to the first question, the evidence is undisputed that the individual defendants made their promotion decisions based on Chief Spears's recommendations and no other independent consideration. The evidence is also undisputed that Chief Spears's recommendations to promote out-of-rank order the three African American candidates (ranked 12th, 17th, and 26th) were based on and because of their race and based on Chief Spears's belief of the necessity to meet a "25%" Consent Decree goal or requirement. It is further undisputed that had Chief Spears's

recommendations followed rank order—which he would have preferred to do (Spears Dep., Dkt. 161-8, at p. 75, lines 4-23)—plaintiffs Finch, Hensley, and Mungovan would have received his recommendations.

As to the second question, it is beyond question that controlling precedent from the Supreme Court and the Seventh Circuit clearly established—long before December 2006 when the promotion decisions were made—that race-based employment decisions are presumptively unconstitutional and can satisfy the requirements of equal protection only where they withstand strict scrutiny. *See Alexander,* 474 F.3d at 444 (citing *Adarand Constructors, Inc v. Pena, 515* U.S. 200, 227 (1995) and *City of Richmond v. J. A. Croson Co.,* 488 U.S. 469, 493-94 (1989)); *Billish v. City of Chicago,* 989 F.2d 890, 893 (7th Cir. 1993).

  2.   The Consent Decree did not require the defendants to make race-based promotion decisions, nor do they pass muster under a strict scrutiny standard.

The court has already determined as a matter of law based on the undisputed facts that the Consent Decree prohibited race-based promotion decisions and, even if it had not, the promotion process followed here does not withstand strict scrutiny. The individual defendants, however, argue that the court should consider *Black* in determining whether they are entitled to qualified immunity. But the decisions in *Black* provide no safe harbor:  they do not purport to change the language of the Consent Decree; they do not consider the Consent Decree's prohibition of race-based promotion decisions; they do not *require* IPD to make race-based decisions; they rejected even for Title VII purposes the argument that race-based promotions within IPD can be justified where promotions are made to achieve a racial population of African Americans in a particular rank mirroring that within Marion County's labor force; and they expressly are not grounded in the equal protection clause. Even if an unpublished district court decision could form part of the controlling precedent establishing the contours of constitutional

53

rights,[32] *Black* is explicit that it does not purport to do so. In *Black I,* the court stated it was not evaluating whether the 1993 promotions at issue there satisfied strict scrutiny, a standard the court acknowledged was different and more demanding than that required for evaluating the legitimacy of an affirmative action plan for Title VII purposes. *Black I,* Dkt. 149-5 at pp. 7-8.

In summary, the individual defendants' argument (Dkt. 166 at pp. 32-34) that they are entitled to qualified immunity because their conduct "complied with strict scrutiny [in that] it complied with the Consent Decree" fails as a matter of law. *Finch v. Peterson,* 622 F.3d 725 (7th Cir. 2010).

3. <u>Chief Spears's reliance on legal advice does not provide immunity to Chief Spears or any other individual defendant.</u>

The defendants argue that even if the Consent Decree does not insulate them from liability, the fact that Chief Spears asked for and received legal advice that his promotion recommendations were in accord with the Consent Decree shields all individual defendants from liability, even if that advice turned out to be wrong. In *Davis v. Zirkelbach,* 149 F.3d 614 (7th Cir. 1998), the Seventh Circuit agreed with sister circuit courts that a court can grant qualified immunity even when an official's conduct violated clearly established law (which he is presumed to know) under some circumstances when the official relied on legal advice in taking action. Reliance on legal advice can rise to the level of an "extraordinary circumstance" in which an official may prove that even though his conduct violated clearly established law, objective factors demonstrate that the official "neither knew nor should have known of the relevant legal standard." *Id.* at 620. The court said that there's nothing "inherently extraordinary" about an

---

[32]     An official is charged with knowing and conforming his conduct to *controlling* precedent from the Supreme Court and from the Seventh Circuit. *Phillips v. Community Ins. Corp.,* 678 F.3d 513, 528 (7th Cir. 2012). The *Black* decisions are not controlling precedent and did not in fact influence the conduct of any of the defendants in this case. There is no evidence any were aware of the decisions.

official's reliance on legal advice "for few things in government are more common than the receipt of legal advice." *Id.* So, in general, advice of counsel does not give rise to a qualified immunity defense.  But some circumstances can rise to the extraordinary level, and the court noted a number of objective factors that may tend to demonstrate that the reliance and advice are of the extraordinary type appropriate to insulate the official from liability:

> [R]eliance on the advice of counsel in certain circumstances rises to the level of extraordinary circumstances. . . . Relevant factors include how unequivocal, and specifically tailored to the particular facts giving rise to the controversy, the advice was, whether complete information had been provided to the advising attorney(s), the prominence and competence of the attorney(s), and how soon after the advice was received the disputed action was taken.

*Id.* (quoting *V-1 Oil Co. v. Wyoming,* 902 F.2d 1482, 1488-89 (10th Cir. 1990) (internal quotations, citations, and footnotes internal to *V-1* omitted).

In *Davis v. Zirkelbach,* the defendant police officers faced legal and factual circumstances the Seventh Circuit determined they reasonably could have thought unusual, and which made them unsure how to proceed.  Upon the officers' inquiry, the lawyer researched the relevant legal issue and explained the bases for his opinion, giving "precise advice" of the manner in which the police officers could proceed legally and the limits they must not cross. That analysis and advice took into account all of the relevant underlying facts. *Id.* at 615 and 620. These circumstances are not present here.

The email chain containing Chief Spears's December 11, 2006 email and the responses to his email (Dkt. 149-21 and Dkt. 149-22) constitutes the evidence the individual defendants rely upon to establish the extraordinary circumstances required by *Davis v. Zirkelbach* for an advice of counsel defense. The defendants note that Chief Spears provided detailed and complete facts, sent the email to three lawyers (Suzannah Overholt, Kevin Murray, and Kobi Wright), stated his desire to work "within all applicable law and the consent decree," and asked for review of his

promotion recommendations "to be certain" that they "are compliant with law." They point to the advice Chief Spears received. Chief Spears was told by Suzannah Overholt (a lawyer with the City) that Kobi Wright (the head of the City's legal department) "said everything looks fine. Therefore you can go ahead with [the promotion recommendations]." (Dkt. 149-21). Mr. Murray, who was Sheriff Anderson's private attorney, emailed Chief Spears to say he "concurred" with Mr. Wright's view. (Dkt. 149-22). And Chief Spears testified that Mr. Wright told him in person that his recommendations were "fine . . . that's what we need to do, that's what the Consent Decree required." (Spears Dep., 161-8, p. 90, lines 10-15).

These circumstances are far from the extraordinary circumstances that would justify qualified immunity based on advice of counsel. The objective reasonableness of a person's reliance on advice should be evaluated in light of what he reasonably is expected to know. It is appropriate to attribute to Chief Spears (and all the individual defendants) knowledge that race discrimination is presumptively unconstitutional and must satisfy strict scrutiny, which requires careful analysis. Mr. Wright's views—as expressed to Chief Spears—do not evidence a careful analysis.  There is not a hint in the evidence as to what Mr. Wright did before pronouncing the recommendation as "fine" or required by the Consent Decree. Further, the advice purportedly is about what the Consent Decree required, but there is no evidence that the purveyor or receiver of the advice read the Consent Decree. The Consent Decree document contains a section titled "Promotions," under which there is a section titled "Affirmative Action to Achieve Stated Goals," and under that section, the very first paragraph says: "Promotions shall be based upon relevant standards and criteria which will be applied without regard to race or color." Unlike the situation presented in *Davis*, it is difficult to see why legal advice was even necessary to

56

determine whether conduct simply and expressly prohibited (race discrimination in promotion) was permissible or required.

To the extent the history surrounding the Consent Decree muddied the issue, "precise advice" would have included acknowledgement that the Decree contained language prohibiting the action that Chief Spears recommended and some legal analysis why Chief Spears could do what the Decree says he could not. Legal analysis along the lines of that requested by the Merit Board in October 2004 might have satisfied the extraordinary circumstances requirement of *Davis.* Then, the Board passed a resolution requiring the City's legal department to analyze the Consent Decree and advise the Board whether it was even complying with its terms when approving promotions (Dkt. 149-14 at p. 61), yet there is no evidence any legal analysis was undertaken or, if any was, what the results were. Mr. Wright's "everything looks fine" is not in the nature of legal advice extraordinary enough to provide immunity for race discrimination, particularly when the decision-makers for police promotions had been confused about the Consent Decree and wanted a written legal analysis that explained its requirements.

Indeed, in this case it is unclear that any legal advice was provided. There is no testimony by Mr. Wright, and thus no admissible evidence, that he actually formed a legal opinion and, even if he did, the bases for his opinion or advice. These evidentiary chasms alone make reliance on counsel an inadequate basis for immunity.  In *Davis,* the Seventh Circuit emphasized a distinction between "routine" advice of counsel and "the more unusual situation" where the depth of the advice is "extraordinary" and therefore warrants a defense of qualified immunity when the law otherwise would not. Whatever the precise boundaries separating the routine from the extraordinary, the court finds no evidentiary support for viewing the advice in this case as extraordinary.

Because of this determination, it is unnecessary to address whether the advice to Chief Spears could shield the other defendants from liability, even though they point to no communications of their own with any counsel or awareness of Chief Spears's communications with counsel regarding his promotion recommendations.

Based on the undisputed facts, the court determines that none of the defendants is entitled to qualified immunity.

### IV. The defendants are entitled to summary judgment on all claims for punitive damages.

The final matter before the court is whether there is evidence upon which a jury could conclude that any of the individual defendants is liable for punitive damages. A jury may award punitive damages against individual defendants in a section 1983 case "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56 (1983). *See also Alexander v. City of Milwaukee,* 474 F.3d 437, 453-54 (7th Cir. 2007) (evidence at trial, viewed most favorably to plaintiffs, allowed jury to conclude defendants acted with reckless and callous indifference to the plaintiffs' constitutional equal protection rights); *Soderbeck v. Burnett County, Wisconsin,* 752 F.2d 285, 291 (7th Cir. 1985) ("The words used to mark off the domain of punitive damages [maliciously, wantonly, oppressively, spitefully] indicate that punitive damages [in section 1983 cases] . . . are reserved for cases where the wrongfulness of the defendant's conduct is conspicuous, implying that its wrongfulness is apparent to the person who engages in it, and not just to a lawyer.")

As discussed throughout this Order, there is a substantial amount of undisputed evidence of an institutional understanding and belief, developed over decades, within IPD and its Merit Board that the Consent Decree allowed or even required the Chief of Police to select for

promotion out of rank order otherwise qualified African Americans because of their race. According to Merit Board member Mike Morken (a lawyer), this common understanding had been around as long as he had served on the Merit Board—since 1988. Though Mr. Morken did not agree the Chief was *required* by the Consent Decree to achieve diversity in merit ranks through out-of-rank order promotions and he was personally opposed to departing from rank order for any reason, he believed the Consent Decree "recommended" race-based promotions as a "goal." (Morken Dep., Dkt. 165-3 at p. 50, line 11 to p. 52, line 13).

The institutional understanding was fed and fostered by the City's lawyers who, in public meetings of the Merit Board in October 2004 and February 2006 (Dkt. 149-14 at pp. 57-61 and 64-65), advised the Board that race-based promotions were permitted. In these public meetings, the lawyers defended as lawful and appropriate (in fact, as "entirely within the law") the promotion of African American officers over a higher-ranked Caucasian officer pursuant to the Consent Decree and because of race. The institutional belief of permissible race discrimination sanctioned by the Consent Decree was even fostered, though mistakenly, by the decisions of this court in *Black,* which granted summary judgment to the City on white officers' Title VII race discrimination claims and upheld race-based promotion decisions in 1993 as legitimate affirmative action under the Consent Decree. Moreover, the belief within IPD that race-based promotion decisions were not unlawful did not arise out of thin air, but out of *some* language in the Consent Decree: "As a long-term goal, [the City and its officials] agree to adopt and seek to achieve a goal of promoting blacks to the ranks of Sergeant, Lieutenant and Captain within the Police Department . . . so as to attain a percentage within those ranks which is reasonably representative of the percentage in the ranks from which promotions are traditionally made." (Section IX.A.1). ). Strangely, though, the evidence shows that until this litigation, nobody—not

even police officers and their counsel challenging promotions as racially discriminatory and not even the court in the *Black* decisions—considered and evaluated the Consent Decree's additional language that the promotions goal was to be achieved without regard to race and color. (Section IX.C.1). Instead, arguments against race-based promotions centered on whether the police department had already achieved its racial diversity goals, an issue far more nuanced than an outright ban on considering race as a factor in making promotions. *(See* Wheeler Grievance materials, Dkt. 149-14, particularly at pp. 4-7).

Against the overwhelming evidence of this widely-held, out-in-the-open, and lawyer-vetted understanding, how could a jury reasonably conclude that Chief Spears's recommendations were the product of malicious or evil intent, or in reckless and conscious disregard of the plaintiffs' constitutional rights? (And the plaintiffs would first have to convince the jury that Chief Spears explained to the Merit Board and Sheriff Anderson that the Consent Decree was the reason he selected for promotion the three officers ranked 12th, 17th, and 26th, for that is the only means by which these defendants knew race was a factor in the promotions when they followed Chief Spears's recommendations.) There is simply no evidence from which a jury could reasonably attach the necessary animus to any of the defendants and award punitive damages.

The plaintiffs maintain the jury could infer that Chief Spears received secret instructions from the Transition Authority—probably Sheriff Anderson—to make racially discriminatory promotion recommendations which Chief Spears and the Transition Authority knew, or at least strongly suspected, were illegal. The plaintiffs suggest this secret plan was hatched when Chief Spears told Sheriff Anderson of the recommendations he intended to make. Plaintiffs then posit Chief Spears prepared his December 11 email as "cover" because he knew promotions

based on race violated the plaintiffs' constitutional rights, was unwilling to act alone, and used the email to force someone else to "go on record" with him. (Plaintiffs' brief, Dkt. 160, at pp. 54-56). Chief Spears's reliance on the Consent Decree was a ruse and a complete fabrication, in the plaintiffs' view. They suggest a jury could find Chief Spears did not believe the Consent Decree allowed race-based promotion decisions and that he knowingly used it as a pretext solely for the December 2006 promotions. *(Id.).* A jury could believe, say the plaintiffs, that Chief Spears's prodding of city attorneys with his follow-up email seeking legal approval was part of the ruse and Chief Spears did not really believe the attorneys' reports back to him that the recommendations were fine and in accord with the Consent Decree. His aim was to obtain cover and once he had it, he was then willing to violate the plaintiffs' constitutional rights. *(Id.).*

In ruling on summary judgment, this court must distinguish between a reasonable inference grounded in the evidence and an unreasonable flight of fancy untethered to any record evidence.  Having carefully read and considered all of the evidence the parties designated, the court is left with the firm conviction that the plaintiffs' punitive damages theory rests in the latter category.  And aside from the lack of evidence in support of it, the plaintiffs' theory cannot be squared with undisputed evidence in the record.  Reliance on the Consent Decree to justify race-based promotions did not originate with Chief Spears or Sheriff Anderson; it had been done for decades.  Furthermore, this conspiracy theory would have required the cooperation of many others.  For example, lawyers for the City (Ellen Gobovitch and Allison Griton) were present at the December 14, 2006 Merit Board meeting too. *(See* Minutes, Dkt. 149-25). Those lawyers would have heard Chief Spears explain to the Merit Board he was making Consent Decree promotions and his remark as he recommended the out-of-order promotions: "The consent decree is very helpful [in] allowing the department to ensure proper diversity and

representation." (Dkt. 161-10 at p. 5).  Moreover, although the "advice of counsel" received here falls short of the "exceptional circumstances" necessary for qualified immunity, it is another factor that convinces the court that a reasonable jury could not award punitive damages consistent with the applicable law.  And to find any other individual defendant liable for punitive damages, the plaintiffs would also need to show that they were somehow implicated in this alleged ruse.

Punitive damages must be reserved for the cases in which it is readily apparent to a government official that he is stomping on a citizen's constitutional rights. If it was not conspicuous enough for the City's lawyers to recognize a constitutional rights violation as it unfolded before their eyes, then Chief Spears and the other individual defendants cannot be penalized with punitive damages for their failure to do so. Accordingly, the court GRANTS summary judgment to the individual defendants on the plaintiffs' request for punitive damages.

### Conclusion

The defendants' motion for summary judgment (Dkt. 148) is GRANTED in PART and DENIED in PART. The plaintiffs' motion for summary judgment (Dkt. 159) is GRANTED in PART and DENIED in PART.

1.     On the plaintiffs' Title VII race discrimination claims, the court (a) GRANTS summary judgment in favor of the plaintiffs against the City of Indianapolis and (b) GRANTS summary judgment in favor of all other defendants.  Determination of the plaintiffs' damages or other relief against the City is a matter for trial.

2.     On the plaintiffs' Title VII retaliation claims, the court (a) GRANTS summary judgment in favor of all defendants with respect to plaintiffs Hensley and Mungovan and (b) GRANTS summary judgment in favor of all defendants, *except* the City of Indianapolis with

respect to plaintiff Finch. Plaintiff Finch's Title VII retaliation claim against the City of Indianapolis is a matter for trial.

3.      On the plaintiffs' race discrimination claims under 42 U.S.C. § 1981, the court GRANTS summary judgment in favor of all defendants.

4.      On the plaintiffs' claims under 42 U.S.C. § 1983 that the defendants violated the plaintiffs' statutory rights under Title VII, the court GRANTS summary judgment in favor of all defendants.

5.      On the plaintiffs' claims under 42 U.S.C. § 1983 that the defendants violated the plaintiffs' constitutional rights to equal protection under the Fourteenth Amendment, the court (a) GRANTS summary judgment in favor of the plaintiffs against the City of Indianapolis; (b) GRANTS summary judgment against the plaintiffs and in favor of the Merit Board and the individual defendants in their official capacities because the claims against these defendants are redundant of the claim against the City; (c) GRANTS summary judgment in favor of the plaintiffs against Michael T. Spears in his individual capacity; (d) GRANTS summary judgment against the plaintiffs and in favor of defendants Bart Peterson and Monroe Gray Jr. in their individual capacities; (e) DENIES summary judgment with respect to the claims against Frank Anderson, Cordelia L. Burks, Mary Maxwell, and Joseph L. Smith, in their individual capacities; and (f) GRANTS summary judgment in favor of all individual defendants on the plaintiffs' request for punitive damages.

In addition, the court determines as a matter of law that none of the individual defendants is entitled to qualified immunity. Determination of the plaintiffs' damages against the City and defendant Spears, excepting punitive damages, is a matter for trial. The claims against

defendants Anderson, Burks, Maxwell, and Smith also remain for trial, including damages but excepting punitive damages.

So ORDERED.

Date:   08/10/2012

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution to all counsel of record via CM/ECF

64